**IN THE COURT OF APPEALS OF IOWA**

No. 15-1825
Filed July 27, 2016

**IN RE THE MARRIAGE OF SANDI I. HANSEN
AND ANDREW J. HANSEN**

**Upon the Petition of
SANDI I. HANSEN,**
        Petitioner-Appellee,

**And Concerning
ANDREW J. HANSEN,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Washington County, Lucy J. Gamon, Judge.


        Andrew Hansen appeals from various provisions of the decree dissolving his marriage to Sandi Hansen. **AFFIRMED AS MODIFIED.**


        Rae M. Kinkead and Matthew J. Adam of Simmons Perrine Moyer Bergman P.L.C., Coralville, for appellant.

        William N. Tooney, John E. Beasley, and Carolyn Russell Wallace of Phelan Tucker Mullen Walker Tucker & Gelman, L.L.P., Iowa City, for appellee.


        Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**DANILSON, Chief Judge.**

Andrew Hansen appeals from various provisions of the decree dissolving his marriage to Sandi Hansen. He raises issues regarding the division of assets, determination of physical care, and determination of Sandi's income for purposes of child support. We modify the decree as to the division of assets, and affirm on the issues of physical care and child support.

**I. Background Facts and Proceedings.**

Andrew (Andy) and Sandi Hansen began their relationship in 2003 and were married in July 2011. The parties have two children together—M.H. and T.H.—and Sandi has an older child, K.R. M.H. was seven and T.H. was two at the time of trial on June 25-26 and September 23, 2015.

At the time of trial, Andy was thirty-five years old and employed as an independent contractor by James Waterhouse Construction. Andy makes twenty dollars an hour and can work up to forty hours per week but ordinarily works fewer hours. Andy earns $41,600 per year. Andy also recently began a firearms business. Prior to beginning work at James Waterhouse Construction in June 2014, Andy worked in the pipeline industry. He made more money working on the pipelines—approximately $80,000 to $90,000 per year—but the job was stressful, dangerous, and required Andy to spend extensive periods of time away from home. Andy was also enlisted in the Iowa National Guard from 2000 to 2008, and served a year in Ramadi, Iraq, from 2004 to 2005.

Andy is diagnosed with post-traumatic stress and a mild alcohol substance abuse disorder. He receives treatment and counseling at the Iowa City Veterans Affairs Medical Center.

Sandi was thirty-nine years old at the time of trial and running a home daycare business. Sandi has an associate's degree in corrections and a bachelor's degree in criminal justice, and she is currently working to obtain a master's degree in family therapy and mental health counseling. Early in the parties' relationship, Sandi worked as a waitress and bartender, and then at a casino, while attending school. Sandi later worked as a correctional officer until the birth of M.H. in 2008. At that time, the parties agreed Sandi would stay home with the children while Andy worked on the pipeline. In May 2013, Sandi began a daycare business out of her home. This allowed her to earn an income while staying at home with the children. Sandi's 2014 income tax return shows a net profit of $11,108 from the daycare business.

The district court entered its findings of fact, conclusions of law, judgment, and decree of dissolution on October 6, 2015. Andy appeals from the court's division of assets, determination of physical care, and determination of Sandi's income for purposes of calculating child support. We will recite additional facts as necessary to address each issue.

**II. Standard of Review.**

We review cases tried in equity, such as dissolution proceedings, de novo. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483-84 (Iowa 2012). "Although we give weight to the factual determinations of the district court, their findings are not binding upon us." *Id.* We will disturb the district court's ruling only when there has been a failure to do equity. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

**III. Analysis.**

    *A. Equalization Payment.* Andy contends the district court inequitably divided the parties' assets and liabilities. He asserts the court erred in (1) failing to consider Andy's parents' $80,000 contribution to the family home; (2) failing to address the Chevy Traverse; (3) dividing Andy's pension; and (4) ordering Andy to pay an equalization payment to Sandi in the amount of $13,590.60.

    "[O]ur courts equitably divide all of the property owned by the parties at the time of divorce except inherited property and gifts received by one spouse." *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). However, "Iowa courts do not require an equal division or percentage distribution. The determining factor is what is fair and equitable in each circumstance." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). In equitably dividing the parties' property, the court considers the factors provided in Iowa Code section 598.21(5) (2013).[1]

    We first address Andy's claim that the district court failed to address the Chevy Traverse. The Traverse was repossessed sometime between the June and September trial dates. Because of the repossession, the district court made no award with respect to the Traverse. We acknowledge the district court could have awarded in the decree any existing right or title to the vehicle subject to any debt. In doing so, any lingering issues could have been resolved in the event

---

[1] Such factors include: the length of the marriage; property brought to the marriage by each party; the contribution of each party to the marriage; the age and physical and emotional health of the parties; the contribution by one party to the education, training, or increased earning power of the other; the earning capacity of each party; the desirability of awarding the family home to the party having custody of the children; the amount and duration of support payments; other economic circumstances; potential tax consequences; any written agreement concerning property division; an antenuptial agreement; and other relevant factors. Iowa Code § 598.21(5).

procedural errors arise that may require possession to be returned to one of the parties, or if after the sale, the parties are entitled to a surplus or have a deficiency to pay.

However, we decline to speculate whether a surplus or deficiency may exist after the vehicle's sale or if the repossession may be set aside for some procedural error. We also note that Andy has not preserved error on this issue as the district court did not address who may be entitled to a surplus or who may be obligated to pay a deficiency. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (explaining error preservation rules require an issue to be both raised and decided before we will consider the issue on appeal). Because we decline to speculate about the possible existence of an asset or debt and decline to reach the merits of an issue when error has not been preserved, we decline any relief on this issue.

Andy also contends division of his pension according to the *Benson*[2] formula is improper. We agree that in a short-term marriage, where both parties are many years away from retirement, division of the pension is often unnecessary for an equitable distribution of the marital assets. Frequently, the pension accounts are in their infancy, or there is a minimal increase in the value of the account during the short-term marriage. Rather than applying the *Benson* formula, this marital asset may be given its due consideration in structuring the balance of the property distribution. In this fashion, the parties may obtain some closure on at least this financial issue. However, here, Andy's pension account increased in value during the marriage by a significant sum, over $29,000.

---

[2] *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996).

Because of the sizable increase in Andy's pension account, we agree it was equitable to divide the pension account via the *Benson* formula.

Andy also argues the district court erred in ordering him to make an equalization payment to Sandi and that such a payment is inappropriate due to the short duration of the parties' marriage. Andy also asserts the family home should not have been considered in the calculation of an equalization payment.

The family home was built by Andy prior to the parties' marriage and prior to their cohabitation. Andy made all payments on the home. Sandi made some contributions to the home such as maintenance, decorating, and landscaping.

Iowa Code section 598.21(5) requires the court to divide "all property, except inherited property or gifts received by one party, equitably between the parties." "This broad declaration means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005).

Premarital property is not set aside like gifted and inherited property. *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2010); *In re Marriage of Miller*, 552 N.W.2d 460, 465 (Iowa Ct. App. 1996). The district court should not separate a premarital asset from the divisible estate and automatically award it to the spouse who owned it prior to the marriage. *Fennelly*, 737 N.W.2d at 102; *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Rather, property brought into the marriage by a party is merely a factor among many to be considered under section 598.21(5). *McDermott*, 827 N.W.2d at 678; *Schriner*,

695 N.W.2d at 496. "[T]his factor may justify full credit, but does not require it." *Miller*, 552 N.W.2d at 465.

Sandi does not dispute the award of the family home to Andy. However, she claims, and Andy challenges, the use of the home's net equity to fix an equalization payment. Certainly, Sandi would have a better claim for a portion of the net equity of the family home if this had been a long-term marriage. We have stated that the claim of a party to the premarital property owned by the other spouse in a short-term marriage is "minimal at best." *In re Marriage of Dean*, 642 N.W.2d 321, 326 (Iowa Ct. App. 2002) (one year); *see also, e.g.*, *In re Marriage of Peiffer*, No. 12-1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (seven years). At the same time, appreciation in the value of assets during the marriage is a marital asset. *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995). With respect to appreciation, our supreme court has stated, "[we do not] find it appropriate when dividing property to emphasize *how* each asset appreciated—fortuitously versus laboriously—when the parties have been married for nearly fifteen years." *Fennelly*, 737 N.W.2d at 104. But here, we have a four-year marriage, and the record is void of evidence showing any appreciation in the home during the marriage. In fact, Sandi acknowledged there was no appreciation in the home's value during the marriage. We can only conclude if there was an increase in the net equity of the family home during the marriage, it was due to the reduction of the debt against it by the mortgage payments.

In light of the facts of this case, we need not align each party's assets and debts in a balance sheet to determine an equalization payment. An equalization

payment suggests each party should be awarded an equal amount of assets and liabilities. Such a payment might be appropriate where both parties brought into the short-term marriage a relatively equal amount of net assets but one party is awarded more of the net assets in the property distribution. Other factors, absent here, could also support an equal division of assets and an equalization payment in a short-term marriage. Iowa is an "equalization distribution" state for purposes of dividing property. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). But to achieve equity, the division need not be equal in most short-term marriages. Rather, it is often equitable to simply award the property to the party that brought it into the marriage. *See In re Marriage of Steenhoek*, 305 N.W.2d 448, 453-54 (Iowa 1981) (ordering property returned to husband in five-year marriage); *see also, e.g.*, *In re Marriage of Wallace*, 315 N.W.2d 827, 830-31 (Iowa Ct. App. 1981) (noting length of marriage can be a major factor in determining each parties' rights).

We also note an "equitable division" of the property of a marriage does not necessarily mean an "equal division" of each asset. *Hazen*, 778 N.W.2d at 59. Our focus is on what is equitable under the circumstances in consideration of the factors set forth in Iowa Code section 598.21(5). *Id.* Here, there were very few significant assets resulting from this short-term marriage, except the marital home.

We find the equalization payment as ordered by the district court in this matter is inequitable because the parties' marriage was short, the family home was Andy's premarital asset, the asset did not appreciate in value, the parties did not enter the marriage with an equal value of assets, and there was no overriding

contribution or sacrifice by either party to support an equal division of the net assets. Rather, we order Andy to pay a cash award to Sandi in the amount of $5000 to be paid within ninety days of the issuance of the procendendo.[3] We conclude this sum is equitable in light of the property division ordered by the district court and to provide some consideration for Sandi's contributions in both maintaining and making improvements to the home such as landscaping and decorating.[4]

Due to our resolution of Andy's challenge to the equalization payment, we find it unnecessary to determine if any monies paid by his parents towards a down payment for the home were either a loan or gift. Sandi does not contend that she contributed to the monies that constituted a down payment for the family home. Clearly, the monies came from either Andy or his parents. Sandi certainly did not agree to any loan terms, so any obligation to repay Andy's parents shall be his sole responsibility.

*B. Physical Care and Visitation.* Andy also contends the district court erred in failing to award the parties joint physical care of the children. In the alternative, Andy asserts he is entitled to more visitation than ordered in the decree.

---

[3] Sandi expended some monies toward the home for decorating, including painting and landscaping. She apparently approximated these expenditures at $4000 during a deposition, but during trial she was not sure the amount was accurate.

[4] After division of property, Sandi retains the value of her home daycare business, the value of her household contents, the wedding rings, and the total amount in her bank account. Andy retains the family home, two vehicles, a 2013 Montana Fifth Wheel, a four wheeler, the value of his household contents, and the total amount in his bank account. Each party was also assigned debts, with Andy retaining a larger amount of liabilities. Both of the vehicles awarded to Andy and the trailer have substantial encumbrances.

In dissolution cases where physical care is at issue, the primary consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o). Iowa Code section 598.41(3) provides factors to be considered in reaching a physical care determination that is in the best interests of the children. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

Upon the request of either parent, the court may award joint physical care unless such an arrangement is not in the best interests of the children. Iowa Code § 598.41(5)(a). In determining if a shared physical care arrangement is appropriate, courts are to consider (1) stability, continuity of caregiving, and approximation; (2) "the ability of the spouses to communicate and show mutual respect"; (3) "the degree of conflict between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *Hansen*, 733 N.W.2d at 696-99.

The record reveals the parties'—particularly Andy's—inability to communicate effectively regarding the children's care and to exercise mutual respect. As evidenced by numerous text messages, Andy often shows a troubling lack of respect for Sandi. Particularly disturbing amongst the text messages are those including comments about the court's authority. In response to Sandi's concern that the children were not returned to her care on time pursuant to a temporary order, Andy referenced a "stupid court order" and that the judge "destroyed my life."

These comments do not invoke confidence that Andy will follow court orders in the future. We can only hope that these comments were out of character or that Andy now recognizes the error of his ways. Regardless, Andy has not always shown an ability to properly communicate with Sandi for purposes of the children's care, or show respect for Sandi, and has not always abided by court orders.

We also observe there remains tension between the parties. During their marriage, the parties often experienced disagreements. On two occasions the arguments resulted in physical violence by Sandi against Andy. The parties separated during their relationship for significant periods of time on at least two occasions. The divorce proceedings only escalated the conflict between the parties, which we hope will subside once the proceedings are concluded. The record reflects a number of examples of Andy's harsh and disrespectful communication with Sandi both in and out of the courtroom.[5] The remaining conflict impedes the parties from having the type of working relationship necessary for a shared-care arrangement to be in the best interests of their children. *See id.* at 698 ("The prospect for successful joint physical care is reduced when there is a bitter parental relationship and one party objects to the shared arrangement.").

The parties have also disagreed concerning day-to-day child-rearing practices. Sandi argues Andy does not provide a good example for the children

---

[5] For an example, during Andy's cross-examination, the following exchange occurred:
> Q. You're telling the mother of your children in a text message to fuck off and she is a piece of shit; correct? A. Yeah. With all the help I've gotten out of her, I feel that's—
> Q. Correct? A. Correct, yes.

regarding good communication skills, and she expresses concern about Andy's attention to the children's basic hygiene needs and ensuring the children get appropriate sleep. Additionally, the parties were involved in two contempt proceedings initiated by Sandi due to Andy's repeated failure to make timely child-support payments.

Upon review of the record, we agree with the district court's application of the *Hansen* factors and the finding that shared physical care is inappropriate.

We also find the district court properly determined Sandi is the best placement for physical care. Sandi has historically been the children's primary caregiver. *See id.* at 697-98 ("[T]he successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality. . . . [W]here one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases."). Also, Sandi's home daycare business allows her to be home to provide care for the children during the day. Most important, the record reflects Sandi is more respectful of Andy and is more likely to support Andy's relationship with M.H. and T.H. Thus, we agree with the district court's custody determination and find physical care should remain with Sandi.

Andy alternatively requests his visitation time be increased. Andy requests the visitation schedule be similar to that of the temporary order, which gave Andy mid-week visitation with the children twice per week and alternating weekends. The district court decreased Andy's visitation to one mid-week visitation and alternating weekends. The court explained:

The court agrees with Sandi that Andy's time with the children should be reduced somewhat by reducing the children's mid-week visits to one overnight per week. Continuing the current schedule of two overnights per week carries the risk of diminishing the children's school performance, particularly as they reach the higher grades in school. This is particularly true since Andy is currently not always ensuring that M.H. has her homework done, is getting adequate sleep, and is ready for school in a timely fashion.

The district court's minimally reduced visitation schedule is in the best interests of the children, while ensuring adequate ongoing contact with Andy. Andy's failure to comply with previous court orders regarding visitation and exchange times, as well as the payment of child support, fosters concern that increased visitation will allow for increased opportunity for disagreements, communication problems, and perhaps, disregard of court orders. It is in the best interests of the children to have fewer dislocations on a weekly basis to provide a more stable home environment, and Andy is still afforded substantial visitation. Thus, we affirm the district court's visitation schedule.

*C. Sandi's Income for Purposes of Child Support.* Last, Andy asserts the district court erred in its determination of Sandi's income for purposes of calculating child support.

Sandi's 2014 tax return shows gross receipts from the home daycare business of $33,988. In expenses, she listed $75 for advertising, $390 for insurance, $939 for repairs and maintenance, and $11,921 for meals and entertainment, totaling $13,325 in expenses. Sandi also claimed a $9555 deductible for the business use of her home. This leaves a net profit of $11,108. The district court attributed income to Sandi in the amount of her net profit for

purposes of calculating child support.[6]  Andy argues that the home-business-use deductible is incorrect and argues that Sandi's income for purposes of calculating child support should be $36,096.

Absent a deviation or variance, child support is calculated based upon each party's "net monthly income."  *See* Iowa Ct. Rs. 9.5, 9.11.  "Net monthly income" is defined as gross monthly income less permissible deductions.  Iowa Ct. R. 9.5.  "Gross monthly income" for purposes of calculating child support is not defined in the guidelines, although we have stated, "Generally, completed federal and/or state income tax returns are the best evidence of income and tax liability."  *In re Marriage of Will*, 602 N.W.2d 202, 204 (Iowa 1999).  Yet "gross monthly income" may not necessarily equate to a party's adjusted net income on their tax return.  *See In re Marriage of Lee*, 486 N.W.2d 302, 304-05 (Iowa 1992) (noting "[t]he guidelines do not limit the definition of gross income to that income reportable for federal income tax purposes"); *see also In re Marriage of Gaer*, 476 N.W.2d 324, 329 (Iowa 1991) (concluding there may be circumstances such as accelerated depreciation where the court "should adjust gross income before applying the guidelines").

Legitimate business expenses may be deducted from income for purposes of determining child support.  *Gaer*, 476 N.W.2d at 329 ("[S]*ome* consideration must be given to business expenses reasonably necessary to maintain the business or occupation."); *see also In re Marriage of Engle*, No. 09-1055, 2010

---

[6] Although it appears the court was attempting to use Sandi's net income of $11,108, in fact, the decree provides "that Sandi's gross income for child support purposes is $11,921."  The sum of $11,921 was the amount of her tax deduction for meals and entertainment.  Because there was no cross-appeal, we only note this discrepancy.

WL 446987, at *5 (Iowa Ct. App. Feb. 10, 2010) (holding that deductions for use of the home, vehicle, cell phone, and garbage pickup services are properly deducted from income for purposes of child support because "the definition of net monthly income as provided in Iowa Court Rule 9.5 generally does not contemplate adding back in deductions that were taken on the Federal Form 1040 and thus excluded from a party's gross monthly income").

Here, the home-business-use deduction was a legitimate business expense, and Sandi's tax return was professionally prepared. Without the benefit of expert testimony or additional evidence that the deduction was unreasonably excessive, we can only conclude the deductions taken by Sandi were reasonably necessary to maintain the home daycare business and were appropriately deducted from her income for purposes of determining child support. Accordingly, we find no inequity in the district court's determination of Sandi's net income.

## IV. Conclusion.

We modify the district court's dissolution decree to eliminate the equalization payment and order Andy to pay a cash award to Sandi in the amount of $5000. All other provisions of the decree are affirmed. Costs of this appeal shall be split equally between the parties.

**AFFIRMED AS MODIFIED.**