# IN THE COURT OF APPEALS OF IOWA

No. 17-0831
Filed September 12, 2018

**IN RE THE MARRIAGE OF JOSHUA ROBERT DEMMER AND
JACQUELYN A. DEMMER**

**Upon the Petition of
JOSHUA ROBERT DEMMER,**
        Petitioner-Appellee,

**And Concerning
JACQUELYN A. DEMMER,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Delaware County, Monica Wittig,

Judge.


        Jacquelyn Demmer appeals from the custody, support, and property

distribution provisions of the decree dissolving her marriage to Joshua Demmer.

**AFFIRMED AS MODIFIED.**


        Dawn D. Long and Kevin C. Rigdon of Howes Law Firm, PC, Cedar Rapids,

for appellant.

        Crystal L. Usher of Nazette, Marner, Nathanson & Shea, LLP, Cedar

Rapids, for appellee.


        Considered by Danilson, C.J., Mullins, J. and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**DANILSON, Chief Judge.**

Jacquelyn (Jacque) Demmer appeals from the custody, support, and property distribution provisions of the decree dissolving her marriage to Joshua (Josh) Demmer. Jacque contends the trial court erred in granting sole legal custody and physical care of the parties' three children to Josh. She also asserts the court improperly placed restrictions on visitation with her parents, erred in not awarding her spousal support, failed to divide the marital property equitably, erred in awarding Josh with the tax dependency exemptions, and improperly calculated child support. Jacque also argues she was entitled to trial attorney fees and asks that we award her appellate attorney fees.

On our de novo review, we modify the decree to provide for joint legal custody and strike the reference to Jacque's parents' care-providing abilities. We award no appellate attorney fees.

**I. Background Facts and Proceedings.**

Jacque and Josh met on line in 2006. Jacque was working full time and living in Cedar Rapids with friends. Josh was working full time as an architect and living with friends in Waterloo. The two were engaged in May 2007.

In June 2007, Jacque was involved in a car accident and, in the aftermath of the accident, she became estranged from her parents. Jacque moved in with Josh following the car accident and began graduate school at the University of Northern Iowa (UNI) in August.

On December 4, and 11, 2007, Jacque and Josh attended two counseling sessions together and, on December 12, Jacque was involved in a serious car accident on her way to work in Cedar Rapids. She sustained several injuries and

required speech therapy after the accident. Though Jacque had previously suffered from migraines, her migraines worsened after the accident and were often debilitating.

In February 2008, Jacque began seeing a counselor, where she focused on the emotional aspects "affect[ing] Jacque's self-esteem and how she interpreted her interactions with other people." In April 2008, Jacque was referred to a doctor for possible medication in relation to anxiety.

Josh and Jacque bought a house in Waterloo in early 2008. To purchase the home, Josh received a gift of $20,000 from his parents for the down payment. In addition, Josh's parents loaned him an additional $20,000 to go toward the down payment.

The parties married on July 26, 2008. She continued treatment and was prescribed medication for anxiety. Jacque gave birth to the parties' first child in May 2010 and experienced post-partum depression and anxiety. She was hospitalized in a psychiatric ward.

In October, Jacque returned to UNI counseling services "to address anxiety issues." She reported being prescribed medication for anxiety and that she was prescribed Darvaset for her migraines but would rather get Hydrocodone again. Jacque graduated with a Masters in School Counseling degree in December 2010.

After graduation, Jacque first worked as a substitute counselor at an elementary school beginning April 3, 2011. The position was supposed to run through the end of the semester but did not. On May 1, Jacque took an overdose of Alprazolam, a benzodiazepine prescribed to treat anxiety. Jacque was about four months' pregnant at the time.

Jacque gave birth to the couple's second child in October 2011. In November, Jacque began working at GMAC Mortgage. Jacque worked there for approximately six months.

In 2012, the parties sold their Waterloo residence and began to rent a house in Manchester where Josh's parents lived. Prior to the sale of their home, Josh and Jacque had borrowed an additional $21,000 from his parents to pay off some of Jacque's high interest student loans. Upon the sale of the Waterloo house, they repaid Josh's parents the $21,000 for payment of the student loan but did not repay the $20,000 loaned to them in 2008 for the down payment.

In early 2012, Jacque was experiencing migraines about three times per week, which left her incapable of caring for the children so Josh would take the children to his mother while he worked.

On June 3, 2012, Jacque was again hospitalized for suicidal thoughts. While she was in the hospital, Josh and his parents cared for the two children.

Jacque resigned from GMAC before her employment was terminated for excessive absences. She then found another position, but did not complete required training, and thus could not continue her employment

About this time period in 2012, a clinical note indicates Jacque "lacks insight, in spite of a lot of explanation about the nature of her illness and importance of taking her medication regularly. Compliance with medication is major problem."

Jacque totaled one of the family vehicles on February 4, 2013.

On October 2, 2013, Jacque again attempted suicide. She took many pills and then sent a message to a friend, who contacted emergency personnel. Both children were present and awake when the police arrived and Jacque was taken

to the hospital by ambulance. After her condition stabilized, Jacque was taken to the inpatient psychiatric ward for a week.

By way of several checks written in 2014, Josh's parents loaned the couple $280,000 to purchase a lot and build a house in Manchester. All of the checks were made payable to Josh Demmer. On December 29, 2014, after the house was constructed, Josh and Jacque signed a note and mortgage for the $280,000 owed to Josh's parents.

On February 6, 2014, Jacque went to take a shower and slit her wrists while Josh and the children were in the living room. Josh found Jacque bleeding, though the cuts were not deep, bandaged her arms, and got her to bed.

In March 2014, the couple found out Jacque was pregnant again. In April 2014, Jacque began to work at Abbe Center in a Delhi facility. She worked there for four months until she found her "dream job" as a school counselor in August 2014. Jacque gave birth to the parties' third child in October 2014. Jacque's employment was terminated on January 5, 2015.[1]

On January 6, 2015, Jacque was again admitted to a psychiatric unit. In February, Jacque was participating in follow-up psychiatric and psychological treatment. After release from the hospital and through March 2015, the children were in full-time day care even though Jacque was home. Jacque then began taking care of the children. On April 5, after an argument with Josh about Easter baskets, Jacque left the family residence with the three children.

---

[1] Jacque's counseling license was suspended for a minimum of three years.

On April 6, 2015, Jacque filed a petition for a domestic abuse protective order. On April 10, Josh filed a dissolution petition, seeking joint legal custody and physical care of the children, as well as an equitable division of the marital property. The district court set a hearing on temporary matters on May 12.

On April 21, a hearing was held concerning Jacque's request for no-contact order. The court made no findings as to Jacque's claims of domestic abuse. The parties consented to a no-contact order and the court entered a temporary order that the children would be with Josh from Friday at 5:30 p.m. to Sunday at 5:30 p.m. and with Jacque the remainder of the week.

At the time of the hearing on the protective order, Jacque was staying in the home of Melissa Davis. On April 28, Jacque sent Davis a disturbing text message. Davis returned to her home about 11:00 p.m. and found Jacque on the front lawn, appearing to be under the influence, and yelling at the neighbor's house. Davis eventually was able to persuade Jacque to go inside. At about 1:00 a.m., Davis discovered Jacque's daughter crying in the bed with her mother. Melissa tried unsuccessfully to awaken Jacque, so she called emergency personnel. Emergency medical personnel arrived and were able to rouse Jacque, who refused treatment or transport. At about 3:00 a.m., Davis informed Jacque she would need to be out of the house that evening. Jacque instead left the house with her children in the early morning hours and checked into a hotel.

Following up on a call, police found Jacque and the children at a hotel.[2] She appeared to under the influence and highly medicated. Josh arrived to take the

---

[2] Interestingly, by the time Jacque spoke with police the following day, Jacque had no text messages to Davis and no contact information for Davis on her phone.

children home, and for the next few months Jacque's visits with the children were supervised.

On November 24, 2015, a hearing on temporary matters was held, and on December 2, the district court entered an order on temporary matters placing the children in Josh's physical care and granting Jacque visitation "on a three-weekends-on, one-weekend-off basis." Jacque also was granted Tuesday evening visits. The court ordered Jacque to pay temporary child support in the amount of $189 per month. The court also entered a modified protective order to address visitation exchanges.

On December 3, Jacque called in to her current employer and said she was not allowed to see her children and was going to commit suicide.

On January 12, 2016, Jacque was stopped by loss prevention personnel at a Target store after being observed leaving the store with $96.15 worth of children's clothing stuffed inside her coat sleeves and purse. She pled guilty to fifth-degree theft on January 26.

A dissolution trial was held on November 16, 17, and 18, 2016. Jacque testified she was living with her parents in Cedar Rapids, Iowa, and there was sufficient room in the house for the children to live there with her. She asserted Josh had emotionally, physically, and sexually abused her throughout their marriage. Jacque stated she continued to engage in counseling and was compliant with her mental health medications. At the time of trial, she was self-employed cleaning houses part-time and earning $15,000 per year. Despite the lack of equity in the Manchester house and Josh's work being in Strawberry Point,

Jacque testified Josh should sell the house, move to Cedar Rapids, and find different employment to co-parent the parties' children in "my hometown."

Josh testified he continued to work as an architect, earning $60,000 per year. He stated his parents had helped him and Jacque financially through much of the marriage, particularly noting a period of time that Jacque purchased thousands of dollars of items online over a period from December 2011 to May 2012. At the time of trial, Josh stated the marital residence was appraised with a value of $265,000. Josh testified that based on the fact that he was the sole support for the children, he had not been able to make the anticipated monthly mortgage payments on the house and the additional interest had been added to the balance of the mortgage the parties' owed to his parents. He stated he and Jacque owed his parents $311,000.

The parties had few assets. Josh had a Principal Life Insurance Policy with a cash value of $5192.16; a 401(k) plan with a value of $42,704.79; a Northwestern Mutual Roth IRA with a value of $18,100; a simple IRA with a value of $13,977.60; and a bank account with a balance of $4657.92. In addition to the $280,000 note, Josh had an outstanding promissory note in the amount of $20,000 for the original house purchase in Waterloo; one credit card debt of $11,386.03 and another card with a balance of $215.00; and owed $118 for a medical bill for one of the children.

The court allowed the record to remain open to allow the parties to undergo objective mental-health testing and submit the results to the court. A psychological report by Marc Wruble was submitted on March 9, 2017.

On May 4, 2017, the district court filed a decree dissolving the parties' marriage. The court made a specific credibility finding concerning Jacque—that

she had a "pattern" of lying and manipulating "the truth to any who will listen to her including counselors, medical providers, investigators, police, and the court personnel." The district court observed, "After watching her for three days in trial, her tracking and truthfulness became more and more concerning."

The court found:

> Jacque has very little stability in her past and that to this court leads it to believe the future holds the same. She cannot cope with the pressures of being a mother to three small children. She has attempted to take her life on numerous occasions, one while she was the sole care provider of the children. She is melodramatic and histrionic. She loves to garner sympathy from others by telling them her tales of a domestically charged relationship. The credibility of the stories was lacking.
> Josh on the other hand has shown that he can maintain the children when they were at their most vulnerable. He has kept them safe, happy and very stable. He seeks assistance when he needs it from appropriate people who love the children and have cared for them in the past to continue with the continuity of care and stability.

The court stated it had "grave concerns for the children while in Jacque's care," noting the "record is replete with details evidencing her inability to cope with the stressors of life and being a parent."[3]

The district court also noted Jacque's "obsession" with social media and her willingness to make her personal grievances public. The court expressed concern about what the children would learn when old enough to be on social media.

The district court concluded Josh should have sole legal custody and physical care of the children, ruling:

---

[3] The district court stated Jacque had at least five attempts on her life. However, the court then detailed four incidents: one in June 2012, one on October 2, 2013, one in 2014, and one on January 6, 2015.
    We also note that in 2011 Jacque overdosed on medication and has had at least five car accidents, the timing of which seem to coincide with emotionally-charged events in her life: December 2007; October 2008; February 2013; December 2014; and January 2015.

Josh and Jacque are very different people when it comes to raising children and their approaches to life. Josh is very family oriented. Jacque is not. Josh is calm and Jacque is not as evidenced in her emotional outbursts in the courtroom and the need to leave during unflattering testimony. Her immaturity is an impediment to her ability to raise the children to be healthy and loving young adults. She does not know how to keep boundaries and has exposed the children to many things they should not have seen at their young ages. Josh has a wonderful support network and many friends and family members who will share in the lives of the children in a very positive manner. The court cannot award joint legal custody in this case as a result of all of these concerns. The court finds that based on the record, it will be difficult, if not impossible, for Josh to be able to rationally discuss the children's needs with her in the future. And, the court would expect that since she has no coping skills, she will continue to resort to the story telling and reporting inaccuracies to authorities that will impact the relationship even more and also negatively influence the children in the future. The court does not find she will be able to support Josh's relationship with the children in a positive manner. Jacque has a great potential to cause a great deal of emotional harm to the children.

The court allowed for the sharing of information about the children but "all decisions relating to the raising of the children shall be made by [Josh]." The court provided for a parenting schedule with Jacque's parenting time to "remain unsupervised unless Josh has any reason to believe that the children will be placed in harm's way by leaving them in her care." The court also ordered, "The children shall not be left in the care of Jacque's parents as the court has significant concerns about their care providing capabilities."

The court ordered Jacque to pay child support in the amount of $352 per month, decreasing to $317 when there were only two children eligible for support, and $220 when only one child was eligible.

The court granted Josh the tax exemption for all three children, noting that "[i]f and when [Jacque] earns sufficient annual income to have a benefit form the

tax exemptions, she shall be entitled to use the second of the three children as an exemption."

With regard to Jacque's request for spousal support, the court found:

> The parties are drowning in debt. There is nothing to divide that will aid either one of them in being self-sufficient given their current circumstances. Looking at the educational issues, both have advance degrees, with Jacque's level exceeding Josh's. Jacque has a black mark on her in the education arena as a result of her own choices. She will be able, however, to use her skills in another arena. Josh will have the obligation of caring for the children, their daily needs, their school needs, their insurance needs, their medical and dental care and the maintenance of a home in which they will reside, without much assistance from Jacque. The court does not find it proper under the current status of the law and these facts to award Jacque alimony.

The court ordered Qualified Domestic Relations Orders be prepared dividing Josh's IRA and 401(k) accounts, ordered Josh to be responsible for the debts owed on the house and additional loans by his parents. Jacque was awarded one-half of Josh's IRA and 401(k) accounts, and a bank account with a balance of about $4000. The court ordered her to be responsible for $13,054.68 owed to Linn County Credit Union. Both parties were ordered to repay their own outstanding student debts. The court noted that "Jacque would technically owe Josh $9572.66" for an equalization payment, but declined to require such a payment "[i]n consideration of the parties' financial circumstances and the amount of student loan debt Jacque is assuming, the fact she is not presently earning what her education would command, and the fact that the court declines to award her attorney's fees."

Jacque appeals.

**II. Standard of Review**

Appellate review of a district court's determinations regarding custody and visitation in a dissolution proceeding is de novo. *In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985). "We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented." *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). We are especially deferential when the district court makes credibility determinations about the parties. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984); *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009) (recognizing the district court has the opportunity to "listen to and observe the parties and witnesses" and giving weight to the district court's credibility determinations).

**III. Discussion.**

*A. Legal Custody.* Upon dissolving a marriage involving minor children, the district court must determine whether one or both parents shall have legal custody of the children. *In re Marriage of Hynick*, 727 N.W.2d 575, 578 (Iowa 2007). Legal custody is "an award of the rights of legal custody of a minor child to a parent under which a parent has legal custodial rights and responsibilities toward the child." Iowa Code § 598.1(5) (2015). These rights and responsibilities "include but are not limited to decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." *Id.*

Jacque contends the district court should have granted the parents joint legal custody of the children. Joint legal custody affords both parents "legal custodial rights and responsibilities toward the child." *Id.* § 598.1(3). "[N]either parent has legal custodial rights superior to those of the other parent." *Id.*; *see*

*also Gensley*, 777 N.W.2d at 714. To award sole legal custody there must be clear and convincing evidence that joint legal custody "is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed." Iowa Code § 598.41(2)(b). In considering what custodial arrangement is in the children's best interest, this court considers the various factors set forth in Iowa Code section 598.41(3).[4] Parents' "utter inability to communicate with each other" as a result of their "toxic relationship" weighs against joint legal custody. *Gensley*, 777 N.W.2d at 715. The parties' inability to communicate and cooperate must rise above the "usual acrimony that accompanies a divorce." *In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985).

We begin our analysis by noting Josh did not seek sole legal custody and, in fact, agreed to joint legal custody in a November 14, 2016 pretrial stipulation. On appeal, he argues that while he agreed to joint legal custody, he could not have predicted Jacque's allegations during the trial. At no point during the course of the trial were we able to find that Josh sought to amend his pleadings or withdraw from the agreement to joint legal custody.

---

[4] The factors to consider in determining whether joint or sole legal custody should be granted are: (1) whether each parent would be a suitable custodian for the child; (2) whether the psychological and emotional needs and development of the child will suffer due to a lack of active contact with and attention from both parents; (3) whether the parents can communicate with each other regarding the child's needs; (4) whether both parents have actively cared for the child before and since the separation; (5) whether each parent can support the other's relationship with the child; (6) whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity; (7) whether one or both parents agree or are opposed to joint custody; and (8) the geographic proximity of the parents. Iowa Code § 598.41(3).

We also observe that the cases in which sole legal custody is granted demonstrate an exceptional degree of the parties' inability to care for or make decisions regarding the minor child with the other parent.  *See generally Gensley,* 777 N.W.2d at 715 (holding sole legal custody was properly granted to the mother because of the absolute inability of the father to communicate with the mother, and the children were suffering due to the acrimonious relationship between the parents); *In re Marriage of Liebich,* 547 N.W.2d 844, 849 (Iowa Ct. App. 1996) (affirming the district court's order granting sole legal custody to the father, as the mother was incapable of supporting the child's relationship with the father).  *Cf. Rees v. Calef*, No. 2015 WL 3624385, at 83-4 (Iowa Ct. App. June 10, 2015 (reversing sole legal custody where both parents were suitable caretakers, the child was well cared for while visiting noncustodial parent, and evidence showed the parties were able to work together to resolve major issues).

We do share the trial court's concerns about Jacque's histrionics and tendency to dramatize.[5]  However, Jacque is currently complying with her medication regimen and continues to attend mental-health therapy.  A guardian ad litem for the children advocated for the parents to agree to shared care but noted Jacque had moved from Manchester to Cedar Rapids, which made shared care difficult.  And, the parties have been able to communicate via text message to arrange exchanges and inform each other about the children's education and

---

[5] This seems to be a long-standing trait.  In 2008, Jacque reported to her counselor that a "friend told her she is draining and dramatic."

health needs.[6]  Consequently, we strike the portion of the district court's order granting sole legal custody to Josh, and conclude joint legal custody should be established.  However, if Jacque should become hospitalized in the future for psychiatric or related care, during any such hospitalization Josh may make any necessary immediate decisions for the children's best interests without repercussion.

*B. Physical Care.*  Jacque argues she should have the physical care of the children, or at the least have shared care.  We have thoroughly reviewed the record in this case and we find no reason to disturb the placement of the children in Josh's physical care.  We agree with the district court that Jacque's claims of domestic abuse are not credible.  We recognize Jacque has suffered from frequent, debilitating migraines and that she has been challenged by her depression and anxiety.  Throughout, Josh has provided stability and consistent care for the children.  Moreover, it is not in the children's best interest to move the children from the family home and the community of support they have there.

*C. Restrictions on Visitation.*  Jacque asks that in the event that we do not change physical care, she be afforded more parenting time with the children and that we strike the provision relating to the children not being left in the care of Jacque's parents.  Jacque lives and works in Cedar Rapids, which is about forty-five miles from Manchester.  Josh works in Strawberry Point, which is about seventeen miles from Manchester.

---

[6] We presume the parties will strive to act in the best interests of their children and we stress that any interference with the other parent's relationship with the children or a decline in Jacque's mental health may support a modification of legal custody.

The district court set Jacque's parenting time for specified holidays and "every other weekend from 4:30 p.m. on Friday until 6:30 p.m. on Sunday evening," which schedule "is intended to be a minimum schedule." The parties were to share the cost of transportation equally. The trial court made no order of midweek visitation, though both parties in their proposed parenting schedules included one evening of midweek visitation for the other. We find no reason to tamper with the district court's parenting schedule.

Josh did not seek any restriction or supervision of Jacque's parenting time. The trial court gave no reviewable reason for restricting the maternal grandparents' access to the children. We strike that provision of the decree.

*D. Spousal Support and Property Division.* At the time of the dissolution trial, the parties had been married for about eight years. Josh was thirty-nine years old and Jacque was thirty-five. Both have advanced degrees and are physically healthy and capable of working. Jacque is being provided a home by her parents. Josh and the children live in the marital residence originally funded by Josh's parents. The debt for the marital residence—which exceeds the value of the house—is Josh's to repay. Jacque and Josh paid off $21,000 of Jacque's high-interest student loans during the marriage and Jacque was awarded one-half of Josh's 401(k) and IRA accounts. Both parties still have student loan debt for which they are responsible.[7]

Section 598.21A(1) lists the factors to be considered in determining if a spousal-support award is appropriate including, but not limited to: the length of the

---

[7] The district court determined Josh had $16,859 in student loans and Jacque had loans outstanding in the amounts of $49,941 and $8337.

marriage; the parties' age and physical and emotional health; the distribution of property; each party's education level; and the earning capacity of the party seeking support. "Although our review of the district court's award of alimony is de novo, we give that court considerable latitude in making this determination based on the criteria in section [598.21A(1) ]. We will disturb that determination only when there has been a failure to do equity." *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005).

With respect to dividing marital property, "our courts equitably divide all of the property owned by the parties at the time of divorce except inherited property and gifts received by one spouse." *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007).

> However, "Iowa courts do not require an equal division or percentage distribution. The determining factor is what is fair and equitable in each circumstance." *In re Marriage of Hazen,* 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). In equitably dividing the parties' property, the court considers the factors provided in Iowa Code section 598.21(5).[8]

*In re Marriage of Hansen*, 886 N.W.2d 868, 871 (Iowa Ct. App. 2016). Achieving equity does not require an equal division of property in most short-term marriages. *Id.* at 873; *see also Hazen*, 778 N.W.2d at 59. "Our focus is on what is equitable under the circumstances in consideration of the factors set forth in Iowa Code section 598.21(5)." *Hansen*, 886 N.W.2d at 873. As was the case in *Hansen*,

---

[8] Such factors include: the length of the marriage; property brought to the marriage by each party; the contribution of each party to the marriage; the age and physical and emotional health of the parties; the contribution by one party to the education, training, or increased earning power of the other; the earning capacity of each party; the desirability of awarding the family home to the party having custody of the children; the amount and duration of support payments; other economic circumstances; potential tax consequences; any written agreement concerning property division; an antenuptial agreement; and other relevant factors. Iowa Code § 598.21(5).

there were very few significant assets resulting from this eight-year marriage, except the marital home. *See id.* And the parties have no equity in the home. Jacque does not deny the amounts of money owed to Josh's parents.

We find no failure to do equity in the district court's distribution of marital assets and debts and its refusal to award spousal support. Jacque is young and healthy and has an advanced degree. Jacque's inability to work in her "dream job" was of her own doing. Yet, she remains able to work in other capacities. Under the circumstances presented here, we affirm the property distribution and the denial of spousal support.

*E. Tax Exemption.* As Jacque notes in her appellate brief, "The 'general rule' is that the parent given primary physical care of the child is entitled to claim the child as a tax exemption." *In re Marriage of Okland*, 699 N.W.2d 260, 269 (Iowa 2005). The trial court properly awarded the tax exemptions to Josh, who has the three children in his physical care, but provided that should Jacque have sufficient annual income to benefit from the tax exemptions, she would be entitled to use the second of the three children as an exemption.

*F. Child Support.* Jacque submitted a child-support worksheet on November 9, 2016, using an imputed income for herself of $15,000 per year. If Josh was to be custodial parent, Jacque asserted her child support should be $189 per month.

Josh submitted a child-support worksheet using three income levels for Jacque: the first with an annual income of $30,000, which is what she had been earning at her last full-time non-counseling employment ($639.50 per month child support); imputed income of $20,000 or $9.62 per hour ($499 per month child

support); and imputed income of $16,640 or $8.00 per hour ($319 per month). While not specifically stating Jacque's income, it is apparent the district court imputed income of $8.00 per hour to Jacque. There is no reason Jacque cannot work full time, and in light of her education level and prior employment, we find no error in imputing such income. We affirm the district court's award of child support.

*G. Attorney Fees.* An award of trial attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). We find no abuse of discretion; therefore, we affirm the district court's denial of trial attorney fees.

Attorney fees are not a matter of right, but rest in the court's discretion in light of the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal. *Okland*, 699 N.W.2d at 270. We do not award appellate attorney fees.

**IV. CONCLUSION.**

Because the parties agreed to joint legal custody, the trial court should not have granted sole legal custody to Josh. We strike the portion of the district court's order granting sole legal custody to Josh, and conclude joint legal custody should be established. However, if Jacque should become hospitalized in the future for psychiatric or related care, during any such hospitalization Josh may make any necessary immediate decisions for the children's best interests without repercussion.

We find no reason to disturb the placement of the children in Josh's physical care. However, Josh did not seek any restriction or supervision of Jacque's

parenting time, and the trial court gave no reviewable reason for restricting the maternal grandparents' access to the children. We strike these restrictions from the decree.

We find no failure to do equity in the district court's distribution of marital assets and debts and its refusal to award spousal support. The trial court properly awarded the tax exemptions to Josh, but provided that should Jacque have sufficient annual income to benefit from the tax exemptions, she would be entitled to use the second of the three children as an exemption. We affirm the child-support calculation, find no abuse of discretion in the court's denial of trial attorney fees to Jacque, and award no appellate attorney fees.

Costs are taxed one-quarter to Josh and three-quarters to Jacque.

**AFFIRMED AS MODIFIED.**