# IN THE COURT OF APPEALS OF IOWA

No. 18-1308
Filed May 1, 2019

IN RE THE MARRIAGE OF KELSEY N. NEVINS
AND MATTHEW J. NEVINS

Upon the Petition of
KELSEY N. NEVINS,
        Petitioner-Appellee,

And Concerning
MATTHEW J. NEVINS,
        Respondent-Appellant.

_____

Appeal from the Iowa District Court for Davis County, Myron L. Gookin, Judge.

The husband appeals the physical-care, visitation, and child-support provisions of the parties' dissolution decree. **AFFIRMED AS MODIFIED AND REMANDED.**

Heather M. Simplot of Harrison, Moreland, Webber, Simplot & Maxwell, P.C., Ottumwa, for appellant.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**POTTERFIELD, Presiding Judge.**

Matthew Nevins challenges the physical-care, visitation, child-support, and attorney-fees provisions of the decree dissolving his marriage to Kelsey Nevins. Matthew maintains the parties' children should have been placed in his physical care or, alternatively, he and Kelsey should share joint physical care. Additionally, he challenges the district court's determination of each party's income for the purposes of calculating child support and claims the court abused its discretion in ordering him to pay $2000 of Kelsey's attorney fees. On appeal, Kelsey asks that we affirm the district court's decree and award her an additional $16,982.50 in appellate attorney fees.

**I. Background Facts and Proceedings.**

Kelsey and Matthew married in 2009. They are the parents of two minor children: E.N., born in February 2013 and M.N., born in January 2015.

Matthew has worked as a welder for John Deere since 2008. He is routinely laid off for a period each year, though the duration of the lay-off varies. That, in conjunction with his inconstant profit-sharing bonus, causes Matthew's annual salary to fluctuate.

Kelsey has worked a number of different jobs since the parties married. She was fired from some employment and quit others in anticipation of being fired. At the time of the dissolution trial in March and April 2018, Kelsey worked as a nurse for Ottumwa Regional Health Center—where she had worked since September 2015. In September 2016, shortly after she filed a petition for dissolution, Kelsey went on PRN, or "as needed," status at work. She testified she did so at her boss's suggestion because of her ongoing issues with

absences and tardiness, which Kelsey attributed in part to issues with daycare for the children and the turmoil of the separation. The PRN status allows Kelsey more freedom in her schedule to care for the children and schedule various appointments, but Kelsey works significantly fewer hours and earns significantly less than she did working full-time before the parties separated.

Kelsey filed a petition for dissolution in May 2016. The district court entered a temporary custody order a few months later, giving Kelsey physical care of the children. Matthew received scheduled parenting time every other weekend, overnight on Wednesdays until Thursday evening, and on specific holidays.

The period of separation was contentious, with both parties playing a role in the ongoing conflict. Kelsey twice filed for protective orders, but no finding of domestic abuse was ever made. In the first action, the parties stipulated that Kelsey would retain the marital home and that Matthew would only contact or communicate with Kelsey regarding the minor children; Kelsey dismissed the chapter 236 (2016) action. In the second action, a temporary protective order was entered on October 14, 2016. The parties stipulated to a modification of the temporary order on May 12, 2017, which allowed Matthew to attend M.N.'s tee-ball games, of which Kelsey was the coach. No final protective order was entered before the temporary order expired.

As part of the second protective order, Matthew was ordered to have a third party participate in exchanging the children for parenting time, with the exchanges occurring at the local law center. Yet when Matthew began to ask police officers to act as the third party to the exchanges, Kelsey complained.

Both parties continued to otherwise involve the police in their lives, often making reports against the other for perceived wrongs. At trial, Kelsey admitted officers stopped filing reports for each instance either she or Matthew reported, testifying, "Only recently, like, in the last nine months I would say, did they stop making reports every single time. I believe that is because there were so many reports and it was happening so often I think that the officers probably got tired of it and they quit making consistent reports."

Moreover, as the district court noted:

> Each party had a lot to say about the other at trial in this custody dispute, mostly all negative. In the course of two and one-half days of trial, there was time for only one short witness other than the parties. Each party denies the claims of the other or has a different/conflicting view of things. Each party assumes a lot about the other and their motives behind certain actions. At trial, each party experienced difficulty directly answering questions posed to them. They each had so much negativity to share about the other that their answers frequently strayed far from the question posed, apparently in fear they would not otherwise have sufficient opportunity to "dis" the other.
> Matthew claims Kelsey burned his mother's house down. Kelsey claims Matthew shot one of their horses dead and killed one of their dogs, all out of spite. There is no basis for either of these claims other than wild speculation. The allegations and complaints go on and on. Neither party is particularly credible in their complaints about the other. Undoubtedly, some of the incidents complained of have some elements of truth, but it is very difficult to know where fact ends and fiction begins.

At the time of the dissolution trial, both Kelsey and Matthew had new paramours. Kelsey was living with her fiancé, Nick Tucker, who had two children of his own—a twelve year old and an eight year old. Matthew lived with his fiancée, Kristen Spurgeon; Matthew and Kristen had a son born between the second and third day of the dissolution trial. Kristen has no other children.

Following the trial, the court issued a written ruling, finding that joint physical care was not appropriate, as the parties "have no such ability" to communicate and show mutual respect. Additionally, the court found, "[T]here is a high degree of historical conflict and no indication of such conflict lessening or ceasing." The court gave Kelsey physical care of the children because she was historically the primary caregiver and "despite the stress and negativity of the divorce, the children seem to be doing well." Matthew was given scheduled parenting time with the children every other weekend and from after school on Wednesdays until 8:00 p.m. In calculating the child-support obligation, the court declined to impute income to either party and used their respective 2017 incomes—$31,000 for Kelsey and $54,000 for Matthew. Matthew was ordered to pay a corrected amount of $858.40 each month in support.[1] Finally, the court recognized that "[b]oth have caused themselves considerable attorney fees expense," and ordered Matthew to pay $2000 of Kelsey's trial attorney fees because Matthew earned more income than Kelsey and his attorney fees were largely covered by insurance through his employment.

Matthew appeals.

## II. Standard of Review.

"An action for dissolution of marriage is an equitable proceeding and, consequently, this court's review is de novo." *In re Marriage of Thatcher*, 864 N.W.2d 533, 537 (Iowa 2015) (citation omitted).

---

[1] The court initially overlooked that Matthew had another child born between the second and third date of the dissolution trial. In response to a Matthew's motion to reconsider, the court filed a ruling correcting the child-support obligation to $858.40 monthly.

"We review the district court's award of attorney fees for an abuse of discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

## III. Discussion.

### A. Physical Care.

We understand Matthew's primary request is for physical care of the children and, in the alternative, joint physical care. But our case law requires us to first consider whether joint physical care is appropriate and, if not, then to determine which parent is "most likely to bring the child[ren] to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996); s*ee In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007) ("Once it is decided that joint physical care is not in the best interest of the children, the court must choose which caregiver should be awarded physical care."); *see also* Iowa Code § 598.41(5)(a), (b).

We have little trouble determining, as the district court did, that joint physical care is not workable here. "Where the parties' marriage is stormy and has history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes." *Hansen*, 733 N.W.2d at 698. Sharing physical care of children "requires substantial and regular interaction," which Kelsey and Matthew have proved unable to do without involving the police. *See id.* Similarly, they have not shown the ability to communicate and show mutual respect. *See id.* (listing second factor in determining whether joint care is appropriate). The level of conflict between Kelsey and Matthew remained high at the time of the dissolution trial, and there was no evidence the conflict would decrease post-dissolution. *Cf. In re Marriage of Pavlovec*, No. 16-1939, 2017

WL 4049517, at *3 (Iowa Ct. App. Sept. 13, 2017) (affirming an award of joint physical care while recognizing the "not unexpected tension" between the parties at the time of dissolution, but also noting the parties were generally able to communicate civilly and participate in joint activities with the children). In fact, during his testimony, Matthew asked the court to change the time of parenting-time exchanges to take place at the end of the school day so one parent could pick up the children without having to see or interact with the other going forward.

Next, we consider which parent should be given physical care. In reaching this decision, we focus on the best interests of the children. *See* Iowa Code § 598.41(1)(a); *see also Hansen*, 733 N.W.2d at 695 (reaffirming that any physical-care arrangement must "be based on Iowa's traditional and statutorily required custody standard—the best interests of the child"). We do not resolve questions regarding physical care "upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*[*ren*]," and gender plays no role in our decision. *Hansen*, 733 N.W.2d at 695, 700. We consider the statutory factors outlined in section 598.41(3) in reaching our decision. *See In re Marriage of Hansen*, 886 N.W.2d 868, 874 (Iowa Ct. App. 2016) (applying the factors outlined in the subsection to physical-care decisions).

We agree with the district court's determination that Kelsey should have physical care of the children. She has been the primary caregiver for the children. And though Matthew did not go so far as to testify the children were doing well in Kelsey's care, he agreed they were, "for the most part," "happy and well-behaved" during the time he spent with them after the parties separated. Additionally, as the district court noted, Kelsey got the marital home as part of the

stipulated property agreement, so giving Kelsey physical care allows the children to have ongoing stability in their living situation. *See Hansen*, 733 N.W.2d at 700 (providing the court's aim in determining physical care "is to advance gender neutral goals of stability and continuity with an eye toward providing the children with the best environment possible for their continued development and growth").

### B. Visitation.

Matthew asks that he be awarded additional scheduled parenting time with the children each week. Specifically, he asks us to reinstate the Wednesday overnight time he had with the children pursuant to the temporary custody order.

We recognize "liberal visitation rights are generally in the best interests of the children." *In re Marriage of Ripple*, No. 10-0393, 2010 WL 3503439, at *3 (Iowa Ct. App. Sept. 9, 2010) (citing *In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991)); *see also* Iowa code § 598.41(1)(a). And "unless midweek visitation with the non-physical care parent is unduly disruptive, such visitation is appropriate where the parents live in close proximity to each other"— as they do here. *In re Marriage of Schear*, No. 10-1129, 2011 WL 444588, at *6 (Iowa Ct. App. Feb. 9, 2011); *see, e.g.*, *Toedter*, 473 N.W.2d at 235 (granting noncustodial parent one overnight visit per week, where the parents resided in the same school district and continuing and frequent contact with noncustodial parent was in best interests of children). Like the district court's reasoning concluding Kelsey should have physical care of the children because they appeared to be doing well under the temporary order, we similarly see no reason to change the parenting schedule from the temporary order. Additionally, this

change will reduce the number of interactions Kelsey and Matthew are forced to have each week, which we believe is positive.

That being said, we agree with the district court's start time for Matthew's Wednesday parenting time—"from the time the children are dismissed from school, or from 4:00 p.m. when school is not in session"—but adjust the end time to when the children must report to school on Thursday mornings or, when school is not in session, until 4:00 p.m. on Thursdays.

**C. Child Support.**

Matthew maintains the district court incorrectly determined the parties' respective incomes when determining the child-support obligation because the court considered all of the income Matthew earned in 2017—including overtime hours—without "even using a forty hour work week for Kelsey."

Matthew's argument ignores that the district court is charged with "determin[ing] the parents' current income from the most reliable evidence represented." *In re Marriage of Wade*, 780 N.W.2d 563, 566 (Iowa Ct. App. 2010). The calculation of the parents' income includes overtime wages. *See in re Marriage of Kupferschmidt*, 705 N.W.2d 327, 333 (Iowa Ct. App. 2005) ("Overtime wages are within the definition of gross income to be used in calculating net monthly income for child support purposes."). "The legislative intent in establishing the child support guidelines is to provide for the best interests of the child[ren] by determining an adequate level of support for children commensurate with the parents' income and resources." *In re Marriage of Belger*, 654 N.W.2d 902, 906 (Iowa 2002). Moreover, the district court may only use a parent's earning capacity—rather than actual earnings—after "mak[ing] a

determination that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child[ren] to do justice." *In re Marriage of Nelson*, 570 N.W.2d 103, 106 (Iowa 1997). The district court did not make such a finding a here, and we do not find it should have.

We do not address this issue further, as we have adjusted the number of overnights Matthew will parent the children each year, which may trigger the application of the "extraordinary visitation credit" to his child-support obligation. *See* Iowa Ct. R. 9.9 (providing a percentage credit to noncustodial parents who parent their children for at least 128 overnights per year). Insofar as is necessary, the district court will recalculate Matthew's child-support obligation based upon Kelsey's and Matthew's respective incomes at the time of recalculation. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 2015) ("We remand to the district court for a . . . modification of the [parent's] child support obligation based on the present financial circumstances of the parties and the child support guidelines.").

### D. Attorney Fees.

Matthew maintains the district court abused its discretion in ordering him to pay $2000 of Kelsey's attorney fees. At the time of trial, Matthew testified that he paid three dollars out of his paycheck each week as part of his union dues for a service that had covered most of his attorney fees; he estimated he had been required to pay between $400 and $500 out of pocket to his attorney for uncovered expenses. In contrast, Kelsey's attorney submitted an attorney fee statement that showed Kelsey had been billed $18,592.50 at the time of the trial.

Considering the vast difference in out-of-pocket attorney fees and Matthew's larger salary, we cannot say the district court abused its discretion in ordering Matthew to pay $2000 of Kelsey's fees.

**E. Appellate Attorney Fees.**

Kelsey asks that we award her appellate attorney fees; her attorney submitted an attorney fee affidavit showing $16,982.50 in appellate fees. As we have often repeated:

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.

*In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006) (citation omitted).

Based on the discrepancy in Kelsey's and Matthew's respective incomes and Matthew's partial success on appeal, we award Kelsey $2000 in appellate attorney fees.

**IV. Conclusion.**

We affirm the district court's decision to place the parties' children in Kelsey's physical care, but we adjust the parenting-time schedule to give Matthew an additional overnight time with the children each week. As a result of the change in parenting time, we remand to the district court to determine if the extraordinary visitation credit should be applied to Matthew's child-support obligation. We affirm the district court's award of $2000 of attorney fees to Kelsey and award Kelsey $2000 in appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED.**