# IN THE COURT OF APPEALS OF IOWA

No. 17-0889
Filed October 10, 2018

IN RE THE MARRIAGE OF MAX F. HANSEN
AND KARIN L. HANSEN

Upon the Petition of
MAX F. HANSEN,
      Petitioner-Appellant/Cross-Appellee,

And Concerning
KARIN L. HANSEN,
      Respondent-Appellee/Cross-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Mark R. Lawson, Judge.

Max Hansen appeals, and Karin Hansen cross-appeals from the district court's decree dissolving their marriage. **AFFIRMED AS MODIFIED.**

Richard A. Davidson of Lane & Waterman LLP, Davenport, for appellant.

M. Leanne Tyler of Tyler & Associates, PC, Bettendorf, for appellee.

Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Max Hansen appeals, and Karin Hansen cross-appeals from the district court's decree dissolving their marriage. Max asserts the district court's award of spousal support is inequitable. Max also challenges the court's order he pay a portion of Karin's trial-attorney fees. Karin contends the district court should have ordered a greater spousal-support award. Karin also argues the district court improperly determined the parties' most recent postnuptial agreement controlled the division of assets and contends the premarital agreement controlled the property division. Finally she argues the court erred in not awarding her a share of the equity in Max's Davenport residence. Karin requests attorney fees on appeal. We conclude there is no reason to disturb the district court's property distribution, and the district court properly awarded Karin trial-attorney fees. However, we also conclude the district court's spousal support award was inequitable and modify the spousal-support award. We deny Karin's request for appellate-attorney fees.

**I. Background Facts & Proceedings.**

Max and Karin were married on July 3, 2009, when Max was fifty-eight years old and Karin was fifty-six. The petition in this action was filed in June 2016. Karin filed a petition for dissolution in Arizona the same month, but the Arizona action was later dismissed. The trial was held in May 2017.

At the time of the dissolution trial, Max was sixty-six years old. During the parties' marriage, Max worked as president and chief executive officer of JMF Companies (JMF). Max owned thirty-four percent of the company. Max also co-founded and served as the managing member of Dayco Industries (Dayco). Max solely owned Black Bear L.L.C., a holding company for Max's share of commercial

real estate leased to JMF and Dayco. In 2016, Max sold his interest in Dayco and JMF and invested the proceeds. At the time of trial, Max was retired and received income from his investments. Max's net worth was determined to be approximately $15.7 million.

Before entering the marriage at age fifty-six, Karin had a net worth of about $33,000. At the time of the dissolution trial, Karin was sixty-four years old and had established residency in Arizona. Karin worked for JMF for approximately four and a half years of the marriage and for one year she worked for Max's brother's business. Karin began as an administrative assistant, but after earning sufficient certifications, she was elevated to human resources (HR) director at JMF. Karin earned a salary of $65,000 as HR director. Her prior work experience included working as a travel agent, working for a dentist, being a stay-at-home mother, and working for a plumbing and heating company.

Karin moved to Arizona in late 2015. When JMF was sold in 2016, Max gave Karin a gift of one million dollars. The purpose of this gift, according to Max, was to make Karin more financially secure because she would no longer receive a salary from her job at JMF. Karin testified at trial she was forced into retirement due to the sale of the company. Max purchased health and dental insurance for Karin, effective until she turned sixty-five. He also bought a Mercedes automobile for Karin that she subsequently traded in for a Volkswagen—receiving about $20,000 from the trade. At the time of trial, Karin was working as an administrative assistant for a financial broker. She worked twelve hours per week, earning twelve dollars an hour. Karin also had income from a small pension arising from her first marriage and social-security benefits.

Max and Karin executed a premarital agreement in June 2009, just prior to their marriage. During the marriage—in 2011 and 2013—Max and Karin executed two postnuptial agreements. The parties disagree which agreement controls in this appeal.

On appeal, Karin requests a share of the equity in a home owned by Max prior to the marriage. Before Karin moved to permanently live in Arizona the parties lived in the home together in Davenport. Prior to the parties' marriage, Max executed a deed naming them as joint tenants of the Davenport residence. Max explained at trial his intention was to ensure Karin would be able to stay in the home in the event of his death. Karin had no knowledge of this change in title until after these dissolution proceedings were initiated.

In its findings of fact, conclusions of law, and decree of dissolution filed May 30, 2017, the court determined the 2013 postnuptial agreement controlled, Karin was not entitled to one-half interest in the Davenport home, Max had satisfied his obligations under the 2013 agreement, and Karin was not entitled to any additional property. The court awarded Karin spousal support in the amount of $4000 per month commencing June 1, 2017, until June 1, 2025, when the amount of support would be reduced to $2000 per month until Karin's death or remarriage, whichever occurs first. The district court also noted Max had previously been ordered to pay $10,000 in temporary attorney fees, and ordered Max to pay an additional $20,000 towards Karin's trial-attorney fees. Max now appeals and Karin cross-appeals.

**II. Standard of Review.**

Because dissolution proceedings are in equity, our review is de novo. *In re Marriage of Thatcher*, 864 N.W.2d 533, 537 (Iowa 2015). "Accordingly, we

examine the entire record and adjudicate anew the issue of property distribution. We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). In fixing spousal support, the district court has considerable latitude, and we disturb the award only "if it fails to do equity between the parties." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012).

**III. Property Distribution.**

On Karin's cross-appeal, she seeks one-half of the equity in the Davenport residence, which she estimates to be approximately $100,000. Karin also seeks to enforce the premarital agreement and requests an additional $100,000 pursuant to its terms.[1] However, we cannot consider an award of one-half of the equity of the home or any cash settlement in isolation, but rather must consider the entire property distribution to determine if it is equitable to award Karin additional monies. Intertwined in our review of the property distribution is the existence of the premarital agreement and the two postnuptial agreements executed by the parties. This in turn requires a determination of the validity of the agreements.

Max argues the 2011 and 2013 agreements acted to amend the 2009 premarital agreement. Karin asserts the postnuptial agreements were not

---

[1] Karin's brief and reply brief do not make clear if she is seeking $100,000 pursuant to the premarital agreement in addition to half of the equity of the home, or if these are alternative arguments to support the award. However, we understood in oral arguments that she was requesting both half of the equity in the home and $100,000 pursuant to the terms of the premarital agreement. The specific terms of the premarital agreement upon which she relies state that she would receive $100,000 if the parties remained married in excess of five years. For purposes of this opinion, we will assume Karin's request was for both one-half of the equity in the home and an additional $100,000.

amendments to the premarital agreement, but rather entirely new agreements entered into by the parties. Karin further contends postnuptial agreements are not permitted under Iowa law, and she therefore seeks to enforce the 2009 premarital agreement as to the property and homestead distribution provisions.

**A. Premarital Agreement.**

As a general rule, premarital agreements are favored and should be construed liberally to carry out the intention of the parties. *In re Marriage of Christensen*, 543 N.W.2d 915, 918 (Iowa Ct. App. 1995). "The purpose of such contracts is to fix the interests of the respective parties in the property of the other." *See In re Marriage of Pillard*, 448 N.W.2d 714, 715 (Iowa Ct. App. 1989). Iowa Code chapter 596 applies to premarital agreements executed on or after January 1, 1992. Iowa Code § 596.12 (2016).

Neither party contests the original validity of the premarital agreement executed between the parties on June 2, 2009. However, both parties agree the waiver and relinquishment of spousal support is contrary to Iowa law. *See id.* § 596.5(2) ("The right of a spouse or child to support shall not be adversely affected by a premarital agreement."). If we were bound by the remaining terms of the premarital agreement without consideration of any other facts, Karin would be entitled to a sum of $100,000.[2]

A premarital agreement may be revoked after marriage and without consideration. *See id.* § 596.7(1) ("After marriage, a premarital agreement may be revoked . . . [b]y a written agreement signed by both spouses. The revocation is

---

[2] The premarital agreement provided that if the parties remained married in excess of five years but less than ten years Max was to pay Karin the sum of $100,000.

enforceable without consideration."). After the parties were married the parties entered into a written "postnuptial agreement" on October 28, 2011, followed by another postnuptial agreement executed by the parties on May 8, 2013. The 2011 postnuptial agreement provides in part, "NOW THEREFORE, for good and adequate consideration, including the mutual covenants herein expressed, the parties hereby REVOKE the Premarital Agreement entered into on June 2, 2009." We also observe that both the 2011 and 2013 postnuptial agreements have identical severability clauses, which provide:

> Should any article, section, or clause of this Agreement be declared illegal or unenforceable by a court of competent jurisdiction or by legislative decree, then that article, section, or clause shall be deleted from this Agreement to the extent that it violates the law. The remaining articles, sections, and clauses shall remain in full force and effect.

Thus, even if we conclude the 2011 and 2013 postnuptial agreements are otherwise unenforceable, the provision revoking the premarital agreement appears to be valid as it is in writing, was consented to by both parties, and required no consideration.

We next address Max's contention the postnuptial agreements only amended the premarital agreement, as well as the effect and enforceability of the postnuptial agreements.

**B. Postnuptial Agreements.**

Iowa Code chapter 596 governing premarital agreements does not expressly address postnuptial agreements. Most recently, in *Hussemann ex rel. Ritter v. Husseman*, 847 N.W.2d 219, 224 (Iowa 2014), our supreme court addressed postnuptial agreements and Iowa Code chapter 596, stating, "Although

our legislature has authorized antenuptial agreements, it has made no such allowance for postnuptial agreements."

Prior to *Hussemann*, our supreme court addressed the enforceability of agreements entered into by spouses following the marriage:

> There is no provision of Iowa statutory law that expressly authorizes or prohibits enforcement of reconciliation agreements between spouses. While Iowa Code section 598.21(1)(k) states that any mutual agreement made by the parties *may* be considered by the court, this provision does not provide for enforcement of reconciliation agreements specifically, but only that mutual agreements may be considered, among other factors, in making property divisions.

*In re Marriage of Cooper*, 769 N.W.2d 582, 585 (Iowa 2009). Because our legislature has not authorized postnuptial agreements to control or bind the award of property or spousal support in a dissolution action, we consider postnuptial agreements as only one of many factors in dividing property in dissolution proceedings and in fixing spousal support. *See id.*; *see also* Iowa Code §§ 598.21(k), 598.21A(1)(i). Accordingly, in applying the factors set forth in Iowa Code section 598.21(5), the district court may consider the terms of a postnuptial agreement, ignore its terms as inequitable, or adopt its terms in full or in part.

Here, Max contends the 2011 postnuptial agreement serves to amend the premarital agreement, and the 2013 postnuptial agreement amends the 2011 agreement. Thus, Max argues the premarital agreement remains binding as amended. Max relies upon language from a "whereas" provision in the 2011 agreement, which provides in part:

> [T]he parties wish to amend and determine the rights of each in his or her separate income and property, the rights and interests of each in income and property to be acquired during the marriage, and the

rights of the parties in the event the parties separate or the marriage terminates.

Max also cites to *O'Dell v. O'Dell*, 26 N.W.2d 401, 412 (Iowa 1947),[3] for support for his argument that a premarital agreement may be amended by a postnuptial agreement. We are not persuaded.

First, we observe the *O'Dell* decision preceded the existence of Iowa Code chapter 596, and the chapter was intended to unify the law with respect to premarital agreements. *See* Iowa Code § 596.2. Our Iowa Code chapter 596, the Iowa Uniform Premarital Agreement Act (IUPAA), was "modeled after the Uniform Premarital Agreement Act (UPAA), which was drafted by the National Conference of Commissioners on Uniform State Laws in 1983." *In re Marriage of Shanks*, 758 N.W.2d 506, 511-512 (Iowa 2008). In *Shanks*, our supreme court also explained, "[i]n the absence of instructive Iowa legislative history, we look to the comments and statements of purpose contained in the Uniform Act to guide our interpretation of the comparable provisions of the IUPAA." *Id.* The court has also observed, "[o]ur comparison of features of the IUPAA and the UPAA reveals the IUPAA's tendency toward providing more protection to vulnerable parties."[4] *In re Marriage of Erpelding*, ___ N.W.2d ___, ___, 2018 WL 3322921, at *7 (Iowa 2018).

We find persuasive our prior observation:

[T]he Iowa Uniform Premarital Agreement Act refers only to revocation of premarital agreements, not amendments thereto. Iowa Code § 596.7 ("After marriage, a premarital agreement may be

---

[3] "Any executory contract, when the rights of others are not involved, may be rescinded altogether or modified, by the mutual consent of the parties." *O'Dell*, 26 N.W.2d at 412

[4] The principles of statutory interpretation are fully set out in *Erpelding* and need not be repeated here. The court noted we seek to ascertain the legislature's intent when interpreting a statute and "[i]f the statute is unambiguous, we do not search for meaning beyond the statute's express terms." *Id.* at *3.

revoked only as follows: . . .”). This provision differs from the corresponding provision of the Uniform Premarital Agreement Act, section 5, which provides: “After marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties. The *amended agreement* or the revocation is enforceable without consideration.”

*In re Marriage of Frary*, No. 14-1398, 2016 WL 146221, at *2 n.2 (Iowa Ct. App. Jan. 13, 2016). Clearly, the legislature chose to omit the right to amend a premarital agreement after marriage, and “we do not search for meaning beyond the statute’s express terms.” *Erpelding*, 2018 WL 3322921, at *3. Thus, we conclude the *O’Dell* decision is limited to premarital agreements existing before the effective date of Iowa Code chapter 596. *See* Iowa Code § 596.12 (“This chapter takes effect on January 1, 1992, and applies to any premarital agreement executed on or after that date. This chapter does not affect the validity under Iowa law of any premarital agreements entered into prior to January1, 1992.”). We conclude a premarital agreement executed after January 1, 1992, may not be amended after marriage, although it may be revoked, abandoned, or the rights thereunder waived. *See* Iowa Code § 596.7; *see also In re Marriage of Christensen*, 543 N.W.2d 915, 918 (Iowa Ct. App. 1995) (holding premarital agreements can be abandoned like any contract).

Moreover, we are unable to harmonize the use of the term “amend” in the prefatory language of the 2011 agreement with the subsequent specification that the parties “revoke the premarital agreement.” As best we can determine, the parties were trying to amend their rights to property interests and spousal support by revoking the premarital agreement. We reach this determination because the 2011 agreement appears to set forth a methodology for the distribution of all of the

parties' joint and separate property, as well as any rights to spousal support, rather than amend only specific provisions of the original comprehensive terms.[5]

We also find significant the language in the 2013 agreement stating in part, "Whereas the parties entered into a Premarital Agreement on June 2, 2001 [sic], and a Post-Nuptial Agreement on October 28, 2011, which purported to revoke the Pre-marital Agreement." Thus, in the 2013 agreement, the parties acknowledge their 2011 agreement revoked the premarital agreement. The agreement to revoke was in writing, consented to by both parties, and required no consideration. *See* Iowa Code § 596.7(1). The fact that the revocation provision was incorporated in a postnuptial agreement that was unenforceable as an amendment to the premarital agreement and was not binding on the district court is inconsequential because the agreement included a severability clause quoted above. Accordingly, we conclude the premarital agreement was revoked by the 2011 agreement as recognized in the 2013 agreement.

Our analysis of the 2011 and 2013 agreements does not end there however, because if the postnuptial agreements are void contracts, they may not even serve as a factor in the distribution of property or fixing spousal support. *See Cooper*, 769 N.W.2d at 585-87. In *Cooper*, a reconciliation agreement with a condition precedent that required certain conduct of the parties in their marital relationship was determined to be contrary to our no-fault divorce law, and was void. *Id.* The

---

[5] In fact, if the 2011 agreement was enforceable to amend the premarital agreement, the 2011 agreement may be a novation of the 2009 premarital agreement, because it appears to fully discuss the same topics. *See Emmet Cty. Bd. of Supervisors v. Ridout*, 692 N.W.2d 821, 830 (Iowa 2005) (stating that to prove a novation, the following elements must be shown by clear and convincing evidence, "(1) a previous valid obligation; (2) agreement of all the parties to the new contract; (3) extinguishment of the old contract; and (4) validity of the new contract" (citation omitted)).

court concluded, a void contract "should be given no weight in the dissolution proceedings," nothwithstanding Iowa Code sections 598.21(5)(k) and (m).[6] *Id.* at 587. The 2013 agreement recited there was a pending dissolution action in Scott County, Iowa, the agreement was to facilitate a reconciliation, and "amend and restate" the 2011 agreement, noting:

> [T]he parties acknowledge that the post-nuptial agreement executed on October 28, 2011 between the parties has caused significant acrimony, discord, and marital conflict between the parties during the course of their marriage and they agree that to avoid a dissolution of their marriage at this time as a result of such discord, they mutually desire to amend and restate said post-nuptial as set forth herein.

However, neither agreement imposes any conditions upon either party in their interpersonal relationship, and thus, is not in conflict with our public policy of no-fault dissolution or the principles announced in Cooper. Thus, we conclude the agreements do not include an improper condition precedent and are not void.

Postnuptial agreements that affect or waive a spouse's elective share are also unenforceable. *Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219, 224, 226 (Iowa 2014) (stating "over a century ago, we held that 'a contract between husband and wife, with reference to her interest in his estate, is of no validity whatever'" and "we have presumed here that Iowa does not enforce postnuptial agreements that waive a spouse's elective share" (citation omitted)). However, here, neither party's elective share is at issue, and as noted, both postnuptial agreements include severability clauses. Accordingly, they are not void contracts.

---

[6] Iowa Code section 598.21(5) sets out numerous factors to be considered in the equitable division of property including, "[a]ny written agreement made by the parties concerning property distribution," Iowa Code § 598.21(5)(k), and "[o]ther factors the court may determine to be relevant in an individual case." *Id.* § 598.21(5)(m).

The next question is whether both agreements should be considered as a factor or just the last expression of the parties' intent. Similar to the 2011 agreement, the 2013 agreement appears to provide a comprehensive distribution of all of the parties' joint and separate property. Because the 2013 agreement provides that the parties intend to "amend and restate" their agreement, we agree the parties intended the 2013 agreement to control. *See Bank of the West v. Michael R. Myers Revocable Trust*, No. 09-0359, 2009 WL 2960404, at *4 (Iowa Ct. App. Sept. 2, 2009) (acknowledging the "well-settled principle that 'where either party has orally agreed to abandon or rescind . . . a contract, and this is acquiesced in, he may not thereafter maintain an action for its enforcement'") (quoting *Henderson v. Beatty*, 99 N.W. 716, 718 (Iowa 1904)). In light of the parties' intent, we will consider the 2013 agreement as *one* of the factors to consider in determining an equitable property distribution and spousal-support award, but which is not binding on the ultimate distribution of property or the spousal-support award.

**C. Davenport Home.**

Max contends the district court's determination that Karin was not entitled to half of the equity in the Davenport home was correct. Karin asserts this determination was in error. Max owned the home prior to the marriage; thus, the home is premarital property, but it will not be set aside to Max on that fact alone. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2010) ("The district court 'may not separate [a premarital] asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage.'" (quoting *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006)); *see also In re Marriage*

*of Hansen*, 886 N.W.2d 868, 872 (Iowa Ct. App. 2016) (noting property brought into the marriage by a party is merely a factor among many to be considered, which "may justify full credit, but does not require it" (citation omitted)).

Karin notes Max executed a deed in 2007 naming Max and Karin as joint tenants of the Davenport home. Karin argues the deed constituted a gift from Max to Karin of a one-half ownership interests in the home. Max explained at trial:

> Q. So, again, in your own understanding what was the reason there you added [Karin] as a joint tenant on the title to [the Davenport] house? A. Well, just as I indicated before. It was in case I died she would not have to move immediately out of the house because of concerns that my children [did] not approve of her living in a house that I owned.
> Q. Was it your intent that she was going to be a half owner of your house? A. No. And that was made clear . . . at the time that did not mean a conveyance of my ownership of the house.
> Q. Was it more like an estate planning arrangement? A. That's exactly what it was.

We agree with the district court's determination that Karin is not entitled to an interest in the Davenport home. We have previously stated, "Joint ownership of an asset originally owned by one party in a marriage cannot be demonstrated by merely affixing the other party's name to that asset." *In re Marriage of Bishop*, No. 02-1074, 2003 WL 1524449, at *2 (Iowa Ct. App. Mar. 26, 2003) (citing *In re Marriage of Hoffman*, 493 N.W.2d 84, 89 (Iowa Ct. App. 1992)). Thus, in making a division of property in dissolution proceedings, we do not look simply to whether the title to the asset is in a particular party's name. Even if we did, Karin has not identified any appreciation in this asset during the marriage.

Additionally, Karin's testimony that she was not aware of the execution of the deed until the current dissolution proceedings belies her assertion that the deed constituted a gift from Max to Karin of a one-half ownership interest in the

Davenport home. On the contrary, Max stated the execution of the deed was purely for estate-planning purposes. *See Bishop*, 2003 WL 1524449, at *2 (holding where the transfer of property was made "simply for estate planning purposes" it "should not have been divided").

Although not binding on our determination, we observe the 2013 postnuptial agreement provides, "[E]ach party's separate property shall at all times retain its character as separate property, regardless of whether such property is owned, held, or titled in joint tenancy, tenancy by the entirety, or any other form of joint ownership." The parties also agreed, "[E]ach of the parties now own and may hereafter acquire income and property in his or her own rights, and each desire that their ongoing marriage shall not, in any way, change or affect certain individual rights to and in their respective separate property as set forth herein." As he did on the 2009 and 2011 agreements, Max listed the Davenport home as his separate property with respect to the 2013 agreement. Equity does not demand Karin be entitled to an interest in the property or a portion of its equity in light of Max's payments to her in excess of $1,000,000 during the marriage, and all other factors set forth in section 598.21(5).[7]

### D. Lump Sum Payment.

Karin's only other claim of error with respect to the property distribution is the court's failure to award her an additional $100,000 pursuant to the terms of the premarital agreement. Karin asserts, because the 2013 postnuptial agreement was unenforceable to amend the premarital agreement, the $150,000 paid by Max

---

[7] We discuss the property distribution in further detail as it relates to Karin's demand for permanent spousal support.

pursuant to the agreement constituted a gift. Max contends his obligations to Karin respecting property distribution have been satisfied in accordance with the 2013 agreement.

However, as already explained, we have determined the premarital agreement was revoked. Karin makes no alternative claim for additional property and instead relies upon the disparate property distribution as a basis for lifetime alimony. Accordingly, although we disagree with the district court that the 2013 postnuptial agreement binds the property distribution, on our de novo review, we find no reason to disturb the district court's property distribution and affirm on this issue.

## IV. Spousal Support.

The parties both challenge the district court's spousal-support award. Max contends Karin is not entitled to any spousal support. Karin argues her monthly expenses support her claim that she needs lifetime spousal support in the amount of $10,000 per month. The district court ordered Max to pay spousal support to Karin in the amount of $4000 per month from June 1, 2017, to June 1, 2025, and then $2000 per month there after until the death of either party or Karin's remarriage. The district court reasoned:

> Max argues that Karin should be able to find a job as an HR director in Arizona. First, the court finds this to be unlikely. It is doubtful that companies are standing in line to hire [sixty-four]-year-old HR directors with an associate's degree at a salary comparable to what she made in Iowa. Even if she could, she would not be able to enjoy the standard of living she enjoyed during the marriage.
> More to the point, however, is that Karin desires to be at least semi-retired. Max has chosen to retire. If they had remained married, Karin would almost certainly have retired. . . . Karin has earned the right to enjoy her retirement just as much as Max has. She was a loyal employee and a good spouse. She helped build

JMF as HR director, performed the social duties of the marriage, helped manage two houses, and supervised the remodeling of an Arizona property.

The district court ultimately held that traditional alimony should be awarded "under these unique facts." The court explained, "[w]hile this is unusual for an eight-year marriage, it is warranted by the fact the parties married—and divorced—late in life. Also Max can afford it and Karin needs it."

"[W]hether to award spousal support lies in the discretion of the court [and] we must decide each case based upon its own particular circumstances." *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015). "Property division and alimony should be considered together in evaluating their individual sufficiency." *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). There is no absolute right to spousal support. *In re Marriage of Becker*, 756 N.W.2d 822, 825 (Iowa 2008). To determine a spousal support award, "Iowa courts 'are compelled to follow the traditional multifactor statutory framework set' forth in Iowa Code section 598.21A." *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016) (citation omitted).

Under Iowa Code section 598.21A(1):

[T]he court may grant an order requiring support payments . . . for a limited or indefinite length of time after considering all of the following:
    (a) The length of the marriage.
    (b) The age and physical and emotional health of the parties.
    (c) The distribution of property made pursuant to section 598.21.
    (d) The educational level of each party at the time of marriage and at the time the action is commenced.
    (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and

the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

 (f) The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

 (g) The tax consequences to each party.

 (h) Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

 (i) The provisions of an antenuptial agreement.

 (j) Other factors the court may determine to be relevant in an individual case.

There are three kinds of spousal support: traditional, rehabilitative, and reimbursement.[8] *Gust*, 858 N.W.2d at 408. However, "these types are not mutually exclusive." *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015). "[T]here is nothing in our case law that requires us, or any other court in this state, to award only one type of support. What we are required to do is to consider the factors mandated by the legislature contained in section [598.21A(1)] when considering a spousal support award." *Becker*, 756 N.W.2d at 827 (determining that under the particular facts of the case the spousal-support award could not be characterized as strictly rehabilitative or traditional, but was proper upon consideration of the section 598.21A(1) factors). With regard to traditional alimony, our supreme court recently reiterated,

"The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." Traditional support is ordinarily of unlimited or indefinite duration.

 Our cases repeatedly state that whether to award spousal support lies in the discretion of the court, that we must decide each case based upon its own particular circumstances, and that precedent may be of little value in deciding each case. Our cases tend to emphasize the need to closely examine all the statutory

---

[8] Neither rehabilitative nor reimbursement support apply in this case.

factors and the entire record in each case. Further, the various factors listed in Iowa Code section 598.21A(1) cannot be considered in isolation from each other. *See* Iowa Code § 598.21A(1) (noting "all" factors are to be considered by trial court in awarding spousal support); *Schenkelberg*, 824 N.W.2d at 486 (emphasizing that spousal support is calculated based on "all" the factors in 598.21A(1)).

*Gust*, 858 N.W.2d at 408 (internal citations omitted).

On appeal, Karin contends she should be awarded lifetime alimony in the amount of $10,000 per month. However, Max and Karin had only been married six years at the time the petition for dissolution was filed, and less than eight years at the time the dissolution decree was entered. This is not the type of long-term marriage typically warranting traditional spousal support. *See Hansen*, 886 N.W.2d at 872-73. "[T]he duration of the marriage is an important factor for an award of traditional spousal support. Traditional spousal support is often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.'" *Gust*, 858 N.W.2d at 410 (citation omitted). "While neither we nor the legislature have established a fixed formula, the shorter the marriage, the less likely a court is to award traditional spousal support. Generally speaking, marriages lasting twenty of more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Id.* at 410-11.

This marriage has not met the "durational threshold." In cases where some amount of spousal support was awarded in a marriage of this length, our case law is replete with examples of awards of limited duration. *See In re Marriage of Bonnette*, 492 N.W.2d 717, 719 (Iowa Ct. App. 1992) (seven-year marriage, award of $200 per month for three years); *In re Marriage of Matteson*, No. 16-0401, 2017

WL361999, at *4-5 (Iowa Ct. App. Jan. 25, 2017) (eight-year marriage, $1000 per month for thirty months); *Huegli v. Huegli,* No. 16-0607, 2016 WL 1681435, at *3 (Iowa Ct. App. April 27, 2016) (eight-year marriage, $300 per month for five years); *In re Marriage of Amling*, No. 13-1779, 2014 WL 4230222, at *2-3 (Iowa Ct. App. Aug. 27, 2014) (eight-year marriage, award of $2000 per month for forty-eight months); *In re Marriage of Hinshaw*, No. 12-1783, 2013 WL 3273584, at *4 (Iowa Ct. App. June 26, 2013) (eight-year marriage, award of $1000 per month for three years). Of course, an award of spousal support depends on the circumstances of each case. *In re Marriage of Becker*, 756 N.W.2d 822, 825-26 (Iowa 2008).

We also disagree with the district court that the fact the parties married—and now divorced—late in life is a factor warranting traditional alimony in the absence of health issues or other facts to support such an obligation. Age and the length of marriage are factors to consider under section 598.21A, but a spouse who marries late in life does not become responsible for the other spouse's income needs on a permanent basis absent a factor or factors in section 598.21A that make such a determination equitable. To impose such an obligation on a wealthy individual would serve to discourage matrimony in later years.

On our review of the other factors in section 598.21A, we find no other factors that support an award of lifetime spousal support. Karin is in good health; semi-retired; not in need of further education; was sixty-four years of age at the time of the trial; and contributed to the marriage, but there was no evidence of an extraordinary sacrifice. We also acknowledge Karin claims a need for alimony to meet her expenses.

Karin relies heavily in her demand for lifetime spousal support upon the disparate property distribution and the parties' earning capacities. The dissent contends the imbalance of property distribution and earning capacity supports permanent spousal support. There is no question Max received a disparate amount of the property and has a significant greater earning capacity than Karin. However, a similar imbalance also existed in respect to property ownership and earning capacities at the time the parties entered the marriage.

Here the financial well-being of both parties improved substantially from the beginning to the end of their marriage. Karin is leaving the marriage with assets in excess of $1.1 million dollars after entering the marriage with a net worth of $33,000. Max's assets increased in value from $6.1 million to $15.7 million.

The record provides little explanation for the increase in value of Max's business interests. We do know the original value placed on his interests was the book value in 2009 as determined by certified public accountants. The sales were to willing buyers. Max testified, "[U]ntil you sell your assets you don't know what they're worth." Our cases have recognized the distinction between the two values, even noting there are "significant discrepancies" between book value and market value of a closely held company. *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 675 (Iowa 2013) (noting "significant discrepancies between market value and book value have cast doubt on the enforceability of provisions requiring transfers at book value"); *Nw. Inv. Corp. v. Wallace*, 741 N.W.2d 782 (Iowa 2007) (discussing valuation methods); *In re Estate of Frink*, No. 05-1674, 2006 WL 3018160, at *4 (Iowa Ct. App. 2006) ("The term 'book value' is unambiguous and distinct from 'fair market value.'"); *Packard Mills, Inc. v. State Tax Comm'n*, 189 N.E.2d 549, 554–

55 (Mass. 1963) ("Even considering the fair value of its capital stock 'from the standpoint of' Packard as a corporation, that fair value 'may be very different from the value of its corporate property' or from the book value of its assets, which to a large extent reflects accounting concepts having no necessary or immediate relation to fair market values."). The increase in value may also have been due to the change in the economy from 2009 to 2016, flourishing business, or a combination of these factors or others not made of record.

To give further consideration to the property distribution as a factor in fixing spousal support, we observe Max's businesses were premarital property. In respect to premarital property we have stated,

> Premarital property is not set aside like gifted and inherited property. The district court should not separate a premarital asset from the divisible estate and automatically award it to the spouse who owned it prior to the marriage. Rather, property brought into the marriage by a party is merely a factor among many to be considered under section 598.21(5). "[T]his factor may justify full credit, but does not require it."

*Hansen*, 886 N.W.2d at 872 (citations omitted).

We have also noted, "[T]he claim of a party to the premarital property owned by the other spouse in a short-term marriage is 'minimal at best.'" *In re Marriage of Dean*, 642 N.W.2d 321, 326 (Iowa Ct. App. 2002) (one year); *see also*, *e.g.*, *In re Marriage of Peiffer*, No. 12-1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (seven years). At the same time, appreciation in the value of assets during the marriage is a marital asset.[9] *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995). With respect to appreciation, our supreme court has stated, "[We

---

[9] Karin's claim for lifetime spousal support is more focused on the appreciation of Max's premarital assets.

do not] find it appropriate when dividing property to emphasize how each asset appreciated—fortuitously versus laboriously—when the parties have been married for nearly fifteen years." *Fennelly*, 737 N.W.2d at 104.

Where premarital property appreciated in a seven-year marriage our supreme court stated, "[A]n equitable property division of the appreciated property should be a function of the tangible contributions of each party and not the mere existence of the marital relationship." *In re Marriage of Lattig*, 318 N.W.2d 811, 815 (Iowa 1982). Our court distinguished *Lattig* in *In re Marriage of Treimer*, No. 09-1390, 2010 WL 1579646, at *5 (Iowa Ct. App. Apr. 21, 2010), noting a stronger argument exists to share in the appreciation of an asset where the original asset was purchased during a ten-year marriage.

Here, the parties had a fairly short-term marriage and Karin's claim to any additional property is minimal at best. *See Hansen*, 886 N.W.2d at 872. Thus, the principles espoused in *Lattig* are more closely aligned to these facts than the facts in *Fennelly*.

The district court described Karin's contributions, "[S]he was a loyal employee and a good spouse. She helped build JMF as HR director, performed the social duties of the marriage, helped manage two houses, and supervised the remodeling of an Arizona property." Notwithstanding these contributions, the district court relied upon the 2013 agreement and did not award Karin any additional property but did award permanent spousal support.

Our review of the record does not support the conclusion that Karin—as an administrative assistant or as the HR director for JMF—contributed in any significant or substantial manner to the success of the businesses or their

appreciation in value. There was no identification of any significant role or responsibilities she may have had, or services she may have provided that directly or indirectly caused or assisted in the appreciation in value of the businesses during the four and one-half years she was employed by JMF. The only limited exception may be her efforts to train individuals to replace her as JMF's HR director. There was no evidence that she made any contributions to Max's other companies, Dayco, or Black Bear L.L.C.

Moreover, during her time as an employee, she was paid a salary and she acknowledged the only household expense to which she contributed was groceries. Our record simply does not support the conclusion Karin played a major role in Max's corporations or their appreciation in value. The parties had only been married six years when the petition was filed in this case, and they had been separated for about one year preceding its filing. We acknowledge Karin's contributions to the marriage and in social settings with Max, and acknowledge she did not shirk her duties. *See Fennelly*, 737 N.W.2d at 103-104.

In sum, in light of Max's efforts to provide support to Karin, namely the $150,000 payment; the $1,000,000 gift; the purchase of a $82,000 vehicle; furnishing health and dental insurance; and considering the imbalance of assets and earning capacity at the outset of this seven year marriage, we are not convinced the imbalance at the end of the marriage alone supports permanent spousal support. Nonetheless, we will consider the other factors in section 598.21A to determine if such an award is equitable.

The fact that Max has the ability to pay $10,000 a month in spousal support is only one factor to consider. *See* Iowa Code § 598.21A. The ability to pay must

be balanced against the needs of the other spouse. *In re Marriage of Stark*, 542 N.W.2d 260, 262 (Iowa Ct. App. 1995). "[T]he yardstick for determining need has been the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Gust*, 858 N.W.2d at 411 (citation omitted). "The standard for determining need is . . . objectively and measurably based upon the predivorce experience and private decisions of the parties, . . ." *Id.* But again, this principle applies to long-term marriages. *Id.* at 411-12.

Here, the evidence reflects the parties enjoyed a relatively financially restrained lifestyle during their marriage notwithstanding their financial well-being. The parties did belong to country clubs and owned a property in Arizona, but they did not travel or eat out often. They also did not typically splurge on expensive items.

Moreover, we are unable to conclude Karin has experienced a "life pattern" or became accustomed to a lifestyle for any substantial period of time that she is entitled to maintain at Max's expense. At the time of the marriage, Karin was age fifty-six, had held various jobs, was earning $55,000 in annual income, was accustomed to the cost of living in Iowa, had accumulated a net worth of about $33,000, and resided in a modest home. Karin's life patterns were largely set before entering the marriage. Following the parties' separation, Karin resided in Arizona—where there is a higher cost of living than Iowa—in a four-bedroom home worth $420,000 with a pool and a hot tub, and has taken up the hobby of owning and riding horses. We do not find Max is obligated to support a lifestyle for Karin that is beyond the lifestyle the parties enjoyed while married and living in Iowa,

even in the short term. "A party receiving alimony is not entitled to support in an amount to achieve a higher standard of living." *Stark*, 542 N.W.2d at 262.

Karin claims monthly expenses in the amount of $12,620 per her financial affidavit filed May 15, 2017. Notwithstanding her purchase of the home in Arizona, Karin still has liquid assets exceeding $1,000,000. In addition to the monetary payments made by Max to Karin, he purchased her an $82,000 vehicle and prepaid her health and dental insurance premiums until she reaches the age of sixty-five.

Karin contends her monthly expenses have increased during the pendency of the dissolution. In September 2016, Karin filed a financial affidavit identifying total monthly expenses of about $7210. Karin has now purchased a home and lists over $800 more in housing expenses than she first reported. We also observe her monthly expenses for travel, groceries, entertainment, clothes, and personal care have all been increased from her last filed affidavit to the tune of a total of $1628. Some of these expenses—such as clothes and shoes ($1500) and entertainment ($750)—appear excessive at least in view of the Iowa cost of living. Karin also reports expenses related to her horseback riding hobby in the amount of $1391. Excluding the hobby-related expenses, we would be gratuitous to say her remaining monthly expenses exceed $9000 under the Arizona cost of living standard.

We acknowledge parties may not enter into a binding premarital contract affecting spousal support,[10] but the provisions of an antenuptial agreement is one

---

[10] *See In re Marriage of Shanks*, 758 N.W.2d 506, 514 (Iowa 2008).

of the criteria identified in determining spousal support. Iowa Code § 598.21A(i). We note Max and Karin reached an agreement respecting spousal support in the 2013 agreement. The 2013 agreement provided in the event of divorce, "Max Hansen shall pay Karin Hansen fifty-five thousand dollars ($55,000) per year for spousal support until Karin Hansen's death, Max Hansen's death, or until Karin Hansen turns sixty-five years (65) whichever is the first to occur."

As we have noted, Karin has been the benefactor of a $1,000,000 gift from Max and he paid her an additional $150,000 that Karin contends was a gift. Gifted property can be considered in assessing the need for alimony." *See In re Marriage of Hardy*, 539 N.W.2d 729, 732 (Iowa Ct. App. 1995). Karin planned to work full time a few more years before Max's businesses were sold resulting in Karin losing her employment. Max provided the $1,000,000 gift at least in part because of Karin's loss of employment and income. Although Max argues Karin should not be entitled to any spousal support, we observe that his payments, purchase of health and dental insurance, and the vehicle purchase were subsequent to his agreement to pay Karin spousal support for three years. Thus, he knew of his agreement at the time he made the payments and purchases and these circumstances lend some weight to at least holding Max to a short-term obligation of support. Of course, his payments could be viewed as an attempt to fulfill his contractual obligations as a lump sum payment of spousal support.

Karin has about $6000 annual income from her part-time employment, social-security income of approximately $16,000, and $5040 from a pension arising from a previous marriage. If Karin could earn a four-percent return on her liquid assets in excess of $1,000,000, she would earn an additional $40,000 each

year.  In total, her annual income likely approximates $67,000, or $5583 gross monthly income.  This sum would exceed her annual income as HR director. Without Max's payments and arrangements for a vehicle and health and dental insurance, or if Karin faced significant health issues, Karin's argument for long-term spousal support would have more appeal.  However, as we have noted, she and Max are both in good health, and equity does not require permanent spousal support in this short-term marriage.

We are also not convinced Karin is entitled to rehabilitative alimony as an "economically dependent spouse."  *See In re Marriage of Francis*, 442 N.W.2d 59, 64 (1989).  Karin has not claimed a need of retraining or reeducation typical of an economically-dependent spouse.  *See id.* at 63.  We acknowledge Karin did rely on Max to pay all their living expenses except groceries, and she was able to use her income as she chose.  Karin's circumstances also changed upon the sale of Max's business causing her to temporarily be out of the work force.  However, she now has part-time employment and considers herself semi-retired.  Although semi-retired, Karin still must become self-sufficient.

Upon consideration of the facts in this matter, we conclude the district court's spousal-support award was inequitable, specifically the length of the award. We recognize Max has made financial efforts to provide for Karin that might be considered a lump sum payment of spousal support, but we conclude Karin is entitled to some additional assistance in transitioning from her married life to a

lifestyle she can sustain on her own.[11]  She faced an anomaly going from minimal reliance upon her salary and earnings to sustain herself to substantial reliance upon her income.  Max has already paid temporary spousal support for ten months in the sum of $5000 per month.  We determine Max should pay Karin spousal support in the amount of $4000 per month for a period of two years or until Karin's remarriage or the death of either party.  This sum is sufficient in light of reasonable living expenses (not Karin's reported living expenses), the lower cost of living in Iowa, and Karin's tax obligations.  This sum will also provide some additional payment for her contributions, and a cushion as she adjusts to self-sufficiency.  Much like in *Becker*, 756 N.W.2d at 827-828, we cannot characterize this spousal support award into one of the three categories but conclude it is equitable considering the factors in section 598.21(3).  We modify the district court's spousal-support award accordingly.

With all due respect to the dissent, there was no intent by this opinion to be guided by any "wholesale acceptance" of the terms of the 2013 postnuptial agreement.  As we have observed, a postnuptial agreement may only serve as a factor in determining the property distribution and spousal support awards.  *See* Iowa Code §§ 598.21(5), 598.21A(1); *see also Cooper*, 769 N.W.2d at 585-87.  The district court fixed the property distribution pursuant to the terms of the  2013 postnuptial agreement disavowed by the dissent.  The only property issues before us related to the validity and enforcement of the agreements and the equity in the

---

[11] During oral argument, although Max's attorney argued there should be no spousal-support awarded, there was no opposition to an award of short-term alimony to allow Karin to adjust.

premarital home owned by Max. Even if we totally disregard the 2013 postnuptial agreement as urged by the dissent, we would reach the same result in respect to the property division and the spousal support. We also do not agree that permanent spousal support should be awarded because the support ordered by the district court would not impose a heavy burden upon Max. If we give due consideration to all factors in Iowa Code section 598.21A(1), an award of permanent spousal support is neither justified nor equitable.

**V. Attorney Fees.**

Last, Max challenges the district court's order that he pay $20,000 to Karin for attorney fees. "We review the district court's award of attorney fees for an abuse of discretion." *Sullins*, 715 N.W.2d at 247. "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Id.* at 255 (citation omitted). We do not find the district court's award of attorney fees constitute an abuse of discretion under the facts of this case and the respective abilities of the parties to pay.

Karin also requests appellate-attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *McDermott*, 827 N.W.2d at 687 (citation omitted). "In determining whether to award appellate attorney fees, we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (citation omitted). Because Karin has been unsuccessful in her claims on cross-appeal, we conclude her claim for appellate-attorney fees should be denied.

**VI. Conclusion.**

We affirm the property distribution and award of attorney fees provided in the decree, but we modify the court's spousal-support award. Karin's request for appellate-attorney fees is denied.

**AFFIRMED AS MODIFIED.**

McDonald, J., concurs specially; Mullins, J., concurs in part and dissents in part.

**McDONALD, Judge** (concurring specially)

I concur in Chief Judge Danilson's resolution of the property division on the ground the division was equitable under the circumstances presented. *See* Iowa Code § 598.21(1) ("The court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties.").

I concur in Chief Judge Danilson's resolution of spousal support on the ground the award of spousal support was equitable under the circumstances presented. *See* Iowa Code § 598.21A (setting forth relevant factors). Specifically, Max conceded during oral argument that he was willing to pay spousal support for a limited duration.

In the absence of Max's concession, I would hold spousal support is not warranted on the facts presented. First, the purported increase in Max's net worth over the course of the marriage does not support an award of spousal support because there is no evidence Max's net worth actually increased during the course of the marriage. The record reflects Max's net worth, including the *book value* of his companies, was approximately $6.1 million at the time of the marriage. The record reflects Max's net worth, including the proceeds received for the sale of his companies at *fair market value*, was approximately $15.7 million at the time of trial. Our cases recognize that book value and market value are distinct methods of valuation and that there can be "significant discrepancies" between book value and market value of a company. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 675 (Iowa 2013) (noting "significant discrepancies between market value and book value" of a company); *Northwest Inv. Corp. v. Wallace*, 741 N.W.2d 782, 786–88 (Iowa 2007) (discussing valuation methods); *In re Estate of Frink*, No. 05-1674,

2006 WL 3018160, at *4 (Iowa Ct. App. 2006) ("The term 'book value' is unambiguous and distinct from 'fair market value.'"); *see also Packard Mills, Inc. v. State Tax Comm'n*, 189 N.E.2d 549, 554–55 (Mass. 1963) ("Even considering the fair value of its capital stock 'from the standpoint of' Packard as a corporation, that fair value 'may be very different from the value of its corporate property' or from the book value of its assets, which to a large extent reflects accounting concepts having no necessary or immediate relation to fair market values."). Comparing Max's net worth at the time of the marriage based on the book value of his companies to his net worth at the end of the marriage based on the proceeds obtained from the fair-market-value sale of his companies is comparing apples to oranges. On this record, the increase in Max's net worth over the course of the marriage, if any, is indeterminate. The only thing that can be said with any certainty is that Max's net worth at the time of the dissolution was approximately $15.7 million and Karin's was $1.1 million. Karin's argument that she is entitled to substantial traditional alimony to capture the increase in the value of Max's companies is thus unpersuasive.

Second, even assuming Max's net worth increased from $6.1 million to $15.7 million over the course of the marriage, equity does not require Karin be awarded spousal support to capture the increase in Max's net worth. Assuming Max's net worth increased from $6.1 million to $15.7 million over the course of the marriage, his net worth increased approximately 157 percent. In contrast, Karin's net worth increased from $33,000 to approximately $1.1 million over the course of the marriage, which is an increase of approximately 3233 percent. When we compare the parties' respective premarital and postmarial financial circumstances,

Karin improved her financial position twenty times more than Max, relatively speaking.  In my view, equity does not require she be awarded substantial traditional alimony because she exited the marriage in a superior position, relatively speaking.

Third, the facts and circumstances of this case do not support an award of any of the generally-recognized forms of spousal support.  "Our cases applying the statute have identified three kinds of support: traditional, rehabilitative, and reimbursement."  *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015).

Traditional spousal support is inapplicable here.  Traditional spousal support may be awarded in marriages of long duration to allow the recipient spouse to continue to live the lifestyle to which he or she had become accustomed over a lengthy period of time.  *See id.*  Generally, only "marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support."  *Id.* at 410–11.  This case is not close to the durational threshold supporting a claim for traditional alimony.  The district court erred in two respects in concluding Karin should be awarded traditional support merely because she had a need for support and because Max had the ability to pay traditional support.  Factually, the evidence does not support the finding Karin had any need for traditional support.  Legally, need and ability to pay are relevant in determining the amount and duration of traditional spousal support only after an initial determination such support is justified based on the duration of the marriage.  *See id.*

Rehabilitative support is inapplicable here.  "Rehabilitative spousal support is 'a way of supporting an economically dependent spouse through a limited period

of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting.'" *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 63 (Iowa 1989)). Here, Karin intended to retire rather than continue working and did not require any additional education or retraining, making rehabilitative support inapplicable under the circumstances. Karin concedes rehabilitative support is inapplicable here.

Reimbursement spousal support is not appropriate under the circumstances presented. Reimbursement "support allows the spouse receiving the support to share in the other spouse's future earnings in exchange for the receiving spouse's contributions to the source of that income." *Id.* Here, Max had already built his companies and was well-established at the time the parties married. Karen concedes reimbursement alimony is not appropriate under the circumstances presented.

Our case law has recognized, on occasion, an additional form of spousal support-transitional spousal support. In my view, transitional spousal support is not appropriate under the facts and circumstances of this case. In reaching that conclusion, I think it necessary to flesh out the issue.

Our caselaw has been somewhat inconsistent in discussing transitional spousal support. At least some of our cases recognize transitional support as distinct fourth category of spousal support. *See, e.g.*, *In re Marriage of Lange*, No. 16-1484, 2017 WL 6033733, at *3 (Iowa Ct. App. Dec. 6, 2017) ("Jessica does not need traditional rehabilitative support so much as transitional support while finding suitable employment."); *cf. In re Marriage of Lee*, No. 10–0948, 2011 WL 227573,

at *6–7 (Iowa Ct. App. Jan. 20, 2011) (affirming two-year alimony where wife had same education level as husband and strong employment history). The majority of Iowa caselaw, however, treats transitional support and rehabilitative support as interchangeable or treats transitional spousal support as a subset of rehabilitative support. *See, e.g.*, *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1996) (recognizing transitional support but equating it to rehabilitative support); *In re Marriage of Diekema*, No. 14-0532, 2015 WL 2393449, at *3 (Iowa Ct. App. May 20, 2015) ("The terms 'transitional' and 'rehabilitative' have been used interchangeably."); *In re Marriage of Hinshaw*, No. 12-1783, 2013 WL 3273584, at *4 (Iowa Ct. App. June 26, 2013) (stating the terms are interchangeable); *In re Marriage of David*, No. 06-0239, 2006 WL 3613805, at *4 (Iowa Ct. App. Dec. 13, 2006) (treating rehabilitative and transitional alimony as the same); *In re Marriage of Suchomel*, No. 06-0309, 2006 WL 3436534, at *2 (Iowa Ct. App. Nov. 30, 2006) ("Rehabilitative or transitional alimony 'serves to support an economically dependent spouse through a limited period of education and retraining.' Its objective is self-sufficiency." (citations omitted)); *In re Marriage of Singer*, No. 02-1770, 2003 WL 22807034, at *2 (Iowa Ct. App. Nov. 26, 2003) ("Transitional alimony, also known as rehabilitative alimony, is designed to assist an economically dependent spouse in becoming self-supporting."); *In re Marriage of Harvey*, No. 99-1558, 2000 WL 1158017, at *2 (Iowa Ct. App. Aug. 16, 2000) ("Transitional or rehabilitative alimony may be awarded to allow a spouse a better chance to become secure in the job market.").

In my view, transitional spousal support is separate and distinct from rehabilitative spousal support. *See, e.g.*, *Silvan v. Alcina*, 105 P.3d 117, 124

(Alaska 2005) (noting reorientation support "is essentially transitional and may be awarded for brief periods" as compared to rehabilitation support); *Zaleski v. Zaleski*, 13 N.E.3d 967, 969-70 (Mass. 2014) (recognizing four separate statutory categories of alimony, including rehabilitative and transitional alimony); *Ingram v. Ingram*, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *6 (Tenn. Ct. App., June 7, 2018) ("Tennessee recognizes four separate types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony."). The two forms of support serve different purposes. Rehabilitative support is intended to support the recipient spouse through a limited period of re-education or retraining to allow that spouse to become self-supporting. *See In re Marriage of Becker*, 756 N.W.2d at 826. The critical consideration is the expectation the recipient spouse will have lower earnings for a limited time while investing in his or her human capital to increase future earnings. *See In re Marriage of Hulett*, No. 00-1312, 2001 WL 1658840, at *3 (Iowa Ct. App. 2001) ("The key fact warranting an award is that Lois requires assistance in the short-term to become self-sustaining in the long-term."). In contrast, transitional support applies where the recipient spouse may already have the capacity for self-support at the time of dissolution but needs short-term assistance in transitioning from married status to single status due to the economic and situational consequences of dissolution. The critical consideration is whether the recipient party has sufficient income and/or liquid assets to transition from married life to single life without undue hardship. *See, e.g.*, *In re Marriage of Hinshaw*, 2013 WL 3273584, at *4 (affirming transitional alimony award where spouse testified support "would help her get back on her feet as far as establishing a residence for herself and the

children"); *In re Marriage of Byrne*, No. 03-0788, 2003 WL 23220082, at *3 (Iowa Ct. App. Nov. 26, 2003) ("Of the approximately eighty thousand dollars worth of property she received, less than one half of that amount was in cash or other liquid assets available to assist in her transition to self-sufficiency."); *see also Wofford v. Wofford*, 20 So.3d 470, 474 (Fla. Dist. Ct. App. 2009) ("Bridge-the-gap alimony serves to assist a spouse already capable of self-support during the transition from being married to being single."); *Violette v. Violette*, 120 A.3d 667, 673 (Maine 2015) ("A court may award transitional spousal support to provide for a spouse's transitional needs, including, but not limited to . . . short-term needs resulting from financial dislocations associated with the dissolution of the marriage." (altered for readability)); *Ingram*, 2018 WL 2749633, at *7 ("Lastly, transitional alimony is awarded where economic rehabilitation is unnecessary and is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. In essence, transitional alimony is a form of short-term bridge-the-gap support designed to smooth the transition of a spouse from married to single life." (altered for readability)).

When viewed in this light, it is apparent transitional alimony is not warranted here. Karin had over $1 million in liquid assets at the time of dissolution. She needed no special assistance as she established an independent household. Karen obtained employment. She purchased her own home in Arizona. Max purchased a vehicle for her. She has significant liquid assets that should generate sufficient passive income when combined with her other sources of income to be

self-supporting at a relatively affluent lifestyle. Where a party does not need assistance in transitioning to single life, then transitional support is not appropriate. *See, e.g.*, *In re Marriage of Morgan*, No. 08-0696, 2009 WL 928844, at *5 (Iowa Ct. App. Apr. 8, 2009) (affirming denial of transitional alimony where requesting spouse had "nearly one-half million in investments," had a college degree, and had a history of employment); *In re Marriage of Haman*, No. 08-0124, 2008 WL 3917635, at *3 (Iowa Ct. App. Aug. 27, 2008) (denying traditional and transitional support where wife left "marriage with a net worth of $905,555" and finding that spouse left "the marriage with sufficient assets, including substantial liquid assets, to satisfy her monthly bills").

Although I would not award any spousal support on the facts presented, I nonetheless concur in Chief Judge Danilson's opinion because Max has conceded the relief is appropriate.

**MULLINS, Judge** (concurring in part and dissenting in part).

I concur in part and respectfully dissent in part.

We have a prenuptial agreement that was valid when written and when the parties married. We have two postnuptial agreements that attempted to revoke the prenuptial agreement and substitute new successive agreements. We have Iowa Code chapter 596 (2016) which governs prenuptial agreements and permits revocation of a prenuptial agreement but which does not authorize post-marriage amendments to the prenuptial. *Compare* Iowa Code § 596.7 (noting "[a]fter marriage, a premarital agreement may be *revoked*" (emphasis added)), *with* Uniform Premarital Agreement Act § 5 (1983) (providing a premarital agreement, after marriage, "may be *amended or revoked*" (emphasis added)). We also have Iowa Code section 597.2, which provides that no interest in property owned by a husband or wife "can be the subject of contract between them."[12] Under the facts of this case and Iowa law, the prenuptial agreement was revoked and the purported postnuptial agreements are void. The existence, history, and terms of those agreements have no place in the application of equitable principles which should alone guide the disposition of this case.

In round numbers, Karin's net worth increased during the nearly eight-year marriage[13] by about $1.2 million, $1 million of which is attributed to a 2016 gift from

---

[12] Section 597.2 provides:
> When property is owned by the husband or wife, the other has no interest therein which can be the subject of contract between them, nor such interest as will make the same liable for the contracts or liabilities of the one not the owner of the property, except as provided in this chapter

Chapter 597 contains certain exceptions which are not applicable to the facts of this case.

[13] The majority relies in part on the length of the marriage, contrasting what it calls a seven-year marriage with the fifteen-year marriage in *In re Marriage of Fennelly*, 737 N.W.2d 97 (Iowa 2007). In *Fennelly*, the parties married in December 1990, the petition for dissolution

Max, following the sale of his business which had employed her. Even after gifting Karin that $1 million, Max's net worth increased by about $9.6 million, from $6.1 million[14] to $15.7 million. Max's increase in worth is attributable primarily to increases in the value of premarital assets and earnings during the marriage. The majority's opinion leaves intact the district court's awards to Karin of a net distribution of about $1.2 million and to Max of about $15.7 million, but reduces the district court's award of lifetime alimony to a maximum of $96,000 payable over two years. For the reasons set forth below, I do not believe the result is equitable or justifiable under existing Iowa law.

Before proceeding, I want to address the valuation issue raised by my colleague in the special concurrence. Although I understand his point about potential difference in book value and fair market value—an issue that occurred to me early in this case, but one which I thought better left alone—there are two reasons why I think it is still best to not be distracted by valuation. First, Max conceded the valuation issue at the end of this testimony at trial:

> Q. So you've gone up your net worth during the marriage to Karin approximately eight years increased by 9 million, roughly. A. Roughly. There's—until you sell your assets you don't know what they're worth. So I acknowledge my financial statement was accurate in 2009 and I'll, whatever the legal term is, I'll also agree that my financial affidavit today is accurate.

of marriage was filed in 2004 and trial was held in June 2005. *Id.* at 99–100. The supreme court called it a "nearly" fifteen-year marriage. *Id.* at 99, 104. In the present case, the parties were married in July 2009, the petition for dissolution of marriage was filed in June 2016, and trial was held in May 2017. The distinction may be small, but in fairness, and given the emphasis on the length of the marriages, the *Fennelly* marriage was actually about fourteen and a half years, and the marriage in this case was nearly eight years (when length is measured by date of marriage to date of trial, as the supreme court did in *Fennelly*). *See id.* at 99–100.

[14] This is according to the disclosure in the premarital agreement. I also note his net worth as disclosed in the 2013 postnuptial agreement was about $9.7 million, about four years before trial.

If we ignore Max's admission his net worth increased by roughly $9 million during the marriage and give credence to the real value being sale value,[15] then we reach my second reason for avoiding the issue: if the true value—that is, fair market value—of his business interests was not known and thus not correctly represented[16] at the time of the execution of the prenuptial agreement and postnuptial agreements, then the validity of those agreements would be subject to separate criticism.

Iowa Code section 596.8(1)(c) provides:

> 1. A premarital agreement is not enforceable if the person against whom enforcement is sought proves any of the following:
> . . . .
> c. Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse.

If the special concurrence is correct that "there is no evidence Max's net worth actually increased during the course of the marriage," then the representations made at the time the agreements were signed were not correct and Karin "did not have, or reasonably could not have had, an adequate knowledge of the property" of Max. *See* Iowa Code § 596.8(1)(c). Karin did not raise a challenge to the prenuptial or postnuptial agreements based on such an argument, and our panel has agreed none of the agreements are enforceable. The analysis does not end

---

[15] Max did not raise this issue in his brief on appeal, but argues it in his reply brief to challenge Karin's arguments about the increase in his net worth. It has long been "held that an issue cannot be asserted for the first time in a reply brief." *Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992).

[16] I am not suggesting that Max intended to misrepresent, but I want to illustrate the problem with using the different valuation methods to identify a marital distribution as equitable.

there because the majority opinion relies at least in part on the "intent" of one of the postnuptial agreements. Later in this partial dissent I further address the issue of relying on intent, but in this part of the opinion, I challenge the use of intent of the parties when their supposed intent was based on false assumptions amounting to millions of dollars. Our case law provides that precise valuations of assets are not required in a prenuptial agreement, "a general knowledge of the true nature and extent of the other's properties is sufficient." *In re Marriage of Shanks*, 758 N.W.2d 506, 519 (Iowa 2008) (quoting *In re Marriage of Spiegel*, 553 N.W.2d 309, 317 (Iowa 1996), *superseded by statute on other grounds as recognized in Shanks*, 758 N.W.2d at 510–11). I submit a difference of $9.6 million does not satisfy the disclosure requirement. But, this leads me right back to why we should not consider the problem with valuation and disclosure: it was not briefed as an issue by the parties and the implications on the "intent" of the postnuptial agreement[17] have not been addressed. I agree with the majority's conclusions that Max's premarital assets worth $6.1 million should be awarded to him. I disagree that Karin is entitled to zero of the roughly $9.6 million increases in Max's premarital assets and she should only receive two years of limited alimony. It is the inequitable combination of Karin receiving none of the marital increase in Max's property and the majority's short-term alimony award that I believe is unjust.

The majority found the parties' premarital agreement was revoked and therefore not enforceable. I agree. It also found the postnuptial agreement was

---

[17] We could reasonably find that Max knew his worth was either increasing dramatically or had previously been understated as a reason why he wanted the postnuptial agreement(s).

unenforceable under Iowa law. I agree. The majority determined the terms of the unenforceable postnuptial agreement should be considered as evidence of intent and proceeded to basically enforce its provisions. I disagree because I believe the contract is unenforceable, of no effect. Following "the intent" of the postnuptial agreement, the majority opinion awards to Max all of his assets, including a greater than 250% increase in those assets during the marriage. Efforts to justify the result based on existing case law is respectfully, in my opinion, unconvincing.

First, I do not read *In re Marriage of Cooper*, 769 N.W.2d 582 (Iowa 2009) as controlling or even persuasive to support the majority's use of the unenforceable postnuptial agreement as evidence of intent that should end up controlling the outcome of this case as though the evidence of intent were a magic bullet. I am guided by the *Cooper* court's concluding remarks:

> Further, like our predecessors, we reject the idea of injecting the courts into the complex web of interpersonal relationships and the inevitable he-said-she-said battles that would arise in contracts that can be enforced only through probing of the nature of the marital relationship. Indeed, our no-fault divorce law is designed to limit acrimonious proceedings. Further, a contrary approach would empower spouses to seek an end-run around our no-fault divorce laws through private contracts.
> As a result, we hold that the reconciliation agreement in this case is void. We further believe that as a void contract, *it should be given no weight in the dissolution proceedings.* We recognize that Iowa Code section 598.21(1)(k) and (m) authorizes the court to consider any written agreements and other factors that the court determines to be relevant. *We, nevertheless, conclude that these statutory provisions do not extend to agreements between spouses that are void, such as the one presented here,* because they intrude on the intimacies of the marital relationship and inject fault back into dissolution proceedings. On remand, the district court should divide the property in an equitable fashion without regard to the reconciliation agreement.

*Cooper*, 769 N.W.2d at 586–87 (emphasis added) (internal citation omitted). Now, I recognize the case before us does not involve a reconciliation agreement, but it does involve a void contract. "[A]s a void contract, it should be given no weight in the dissolution proceedings." *Id.* at 587. Further, I think the statutory approval for use of "[a]ny written agreement made by the parties concerning property distribution," found in Iowa Code section 598.21(5)(k) is, in context, a reference to stipulations or settlement agreements made in the course of the parties' negotiations to resolve a dissolution-of-marriage action, not to postnuptial or other unenforceable or void contracts. In this way, the legislative directive from Iowa Code section 597.2 is reconciled with section 598.21(5)(k). I recognize the *Cooper* court's additional reference to what is now section 598.21(5)(m)[18]: "[o]ther factors the court may determine to be relevant in an individual case." However, the majority's rather wholesale acceptance of the void and unenforceable postnuptial agreement to guide it through the "equitable" distribution is a stretch and is contrary to Iowa Code chapters 596 and 597, because a void contract "should be given no weight in the dissolution proceedings." *Id.* Section 598.21(5)(m) should not be read to allow consideration of the unenforceable postnuptial agreement.

Further, I am concerned that the majority is opening the door wide for the future manipulative use of unenforceable postnuptial agreements by married people attempting to influence future divorce actions with "statements of intent."[19] I emphasize my belief that the legislature's inclusion of Iowa Code section

---

[18] *Compare* Iowa Code § 598.21(1)(m) (2005), *with* Iowa Code § 598.21(5)(m) (2016).
[19] The majority is also opening the door for use of unenforceable postnuptial agreements as evidence in will contests or other probate proceedings.

598.21(5)(k) is in the context of dissolution proceedings, not in the context of maintaining a marriage. We have all agreed the legislature did not authorize amending prenuptial agreements during marriage. Thus, I do not believe the legislature intended to authorize postnuptial agreements as statements of intent to be included as a consideration under section 598.21(5)(m). I believe the district court did an admirable job of recognizing an unusual fact pattern and crafting an equitable balance by allowing Max to keep all of the increase in value of his premarital assets and awarding Karin substantial alimony. She was sixty-four years old and had a life expectancy of 20.9 years. The district court awarded her alimony in the amount of $4000 per month for eight years, and $2000 per month until her death or remarriage. Although not all of Max's assets are income producing, the vast majority are and we can expect he will earn substantial sums on those assets. Monthly alimony would only be a drop in the bucket of his earnings. Assuming Karin does not remarry and lives her life expectancy, the alimony would pay to her a little less than $700,000, spread out over 20.9 years. Assuming Max has no return on his investments—an unlikely assumption—the total alimony paid would be approximately seven percent of the increase in Max's net worth during the marriage, would be less than four-and-a-half percent of his total net worth, and would leave him with $15 million in comparison to Karin's total of about $1.9 million.

The majority opinion is critical of Karin's claimed expenses, I find the district court's characterization of the life to which she had become accustomed more compelling:

> While Max testified the parties lived a "frugal" lifestyle during the marriage, the term "frugal" can be amorphous. They purchased a patio home as a second home in Arizona, then sold that home and purchased a larger second home with a pool. They were members of country clubs in both Davenport and Scottsdale, as well as a golf club in Scottsdale. They vacationed in Alaska. They both drove luxury vehicles. The Court finds that–while they were not extravagant–*they lived a lifestyle consistent with a couple who had over one million dollars in annual income*.

(Emphasis added.)

Absent substantial alimony, I would find Karin is entitled to a portion of the roughly $9.6 million dollar increase in Max's premarital assets. The majority quoting from *In re Marriage of Hansen*, 886 N.W.2d 868, 872–73 (Iowa Ct. App. 2016) which quotes *Fennelly*, then relying in part on *In re Marriage of Lattig*, 318 N.W.2d 811, 815 (Iowa Ct. App. 1982), which predates *Fennelly* by more than twenty years, reasons that the mere existence of a seven-year marriage reduces "Karin's claim to any additional property [as] minimal at best." (citing *Hansen*, 866 N.W.2d at 872). In 1982, this court said in *Lattig*:

> As an additional factor in dividing appreciated property acquired before the marriage, we consider whether the appreciation which occurred during the marriage was fortuitous or due to the efforts of the parties. The underlying premise of our analysis is that an equitable property division of the appreciated value of the property should be a function of the tangible contributions of each party and not the mere existence of the marital relationship. . . .
> . . . .
> Where the accumulated property is not the product of the joint efforts of both parties or where, as here, one party brings property into the marriage, there need not necessarily be a division. This is especially true where the marriage was of short duration.

318 N.W.2d at 815 (involving a seven-year marriage). More than twenty years later, the supreme court, without citing to *Lattig* or predecessor cases, said:

> Nor do we find it appropriate when dividing property to emphasize *how* each asset appreciated—fortuitously versus

laboriously—when the parties have been married for nearly fifteen years.  Property may be "marital" or "premarital," but it is all subject to division except for gifts and inherited property.

*Fennelly*, 737 N.W.2d at 104 (citation omitted).

Our court has previously cited *Fennelly*, with an emphasis on the "fifteen-year marriage" circumstance in that case, seeming to indicate fifteen years is some kind of threshold for considering an allocation of increases in premarital property to the other spouse.  And, that is the apparent approach taken by the majority.  I find that reading of *Fennelly* too limiting.

> Although each party's contribution to a marriage is an appropriate factor affecting property division, it is not "useful to analyze the exact duties performed by the marriage partners."  Suffice it to say, neither party shirked his or her duties so as to justify disparate treatment.
> Nor do we find it appropriate when dividing property to emphasize *how* each asset appreciated—fortuitously versus laboriously—when the parties have been married for nearly fifteen years. Property may be "marital" or "premarital," but it is all subject to division except for gifts and inherited property.
> Considering all of the facts and circumstances of this case, we find it equitable to equally divide the appreciation of the parties' premarital assets.

*Id.* (citations omitted).  What the supreme court said was that in that particular fifteen-year marriage it found "it equitable to *equally* divide the appreciation of the parties premarital assets,"[20] without regard to how any asset increased in value. *See id.* (emphasis added).  Does that mean that a party to a marriage of less than seven years should receive *no* part of the appreciation of premarital assets?  What about this nearly eight-year marriage?  At what length of marriage does a spouse become entitled to even a small portion of the marital increase in assets?

---

[20] The premarital assets in *Fennelly* were IBM stock and an IBM tax deferred savings plan. The assets increased in value completely fortuitously during the marriage.

I start with the proposition that premarital property is subject to division in a dissolution action. *See id.* Oftentimes, however, such property is equitably awarded to the spouse who brought the property into the marriage. Next, is the proposition that increases in the value of premarital property during the marriage are subject to division. *Fennelly* tells us that at least under the facts of that case, such increases in a fifteen-year marriage are to be divided *equally*—i.e., 50–50— and without regard to how the asset increased, with no regard to who put forth what effort which resulted in the increase.

The majority's conclusion that it is equitable that Max should receive not only 100% of his $6.1 million premarital property, but also 100% of the roughly $9.6 million increase during a marriage of more than half the length of the *Fennelly-Breckenfelder* marriage defies an equitable analysis.

In this partial dissent, there is no need for me to opine as to an exact amount of property division I would find equitable if alimony is modified as directed by the majority. I might not have quibbled with some reduction in Karin's monthly alimony based on the majority's analysis of her current income needs, but I need not quantify any amount in this opinion, because our fundamental approaches to the case differ so dramatically that it would serve little purpose. Further, Karin did not request a property distribution (i.e. beyond the Davenport home). The fight at the district court and on appeal has been with parties' assumption—and agreement by the district court—that at least one of the prior "agreements" was enforceable as to property distribution, but under Iowa law Karin was free to pursue alimony. By our ruling today, we have eliminated the enforcement of all those agreements. In the exercise of our statutory duties with respect to disposition of property and

spousal support, I would find that long-term alimony is required and obviates the need for a property distribution under the unique facts of this case.

I agree there is no case law that directly provides precedent to support the district court's alimony award. I also find no case that is so close in facts to require a finding that the district court did not reach an equitable result. Further, I do not find Iowa authority which supports using a void or unenforceable postnuptial agreement as a statement of intent for use in an equitable-distribution analysis.[21] Our case law is replete with "each case must be decided on its own merits."

The majority's analysis of spousal support ignores a key fact—the gross imbalance in the property division, especially in light of my view of *Fennelly* as expressed above. The district court wrote a thorough and impressive decree in this case. I would find the result taken as a whole is equitable—no property distribution to Karin, but long-term alimony—and would affirm the alimony ruling by the district court.

I concur with the majority in all other respects. Accordingly, I would modify the district court's determination the 2013 postnuptial agreement was enforceable, and would affirm its decree in all other respects.

---

[21] The majority's reliance on the severability clause does not cure the fact that the contract is unenforceable, not just bits and pieces of it.